Samuel COLEMAN, Plaintiff,

v.

Gordon FRIERSON, et al., Defendants.

No. 82 C 4460.

United States District Court,
N.D. Illinois, E.D.

April 30, 1985.

See also, D.C., 607 F.Supp. 1578.

Abraham Goldman, Steven Ackerman, Chicago, Ill., for plaintiff.

Aldus Mitchell, John K. Kneafsey, Hal Ross Kessler, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Samuel Coleman ("Coleman") originally sued the Village of Robbins ("Robbins"), three of its officials and a Cook County deputy sheriff under 42 U.S.C. § 1983 ("Section 1983"), alleging violations of Coleman's First and Fourteenth Amendment rights in connection with his termina-

tion as a Robbins Special Investigator. By April 23, 1984 only the claims against Robbins, former Robbins Mayor Marion Smith ("Smith") and former Robbins Police Chief Gordon Frierson ("Frierson") remained. On that date this Court issued the "Opinion" (101 F.R.D. 541), granting a default judgment as to liability against all three remaining defendants. That judgment, entered pursuant to the authority conferred by Fed.R.Civ.P. ("Rule") 16(f) to impose "sanctions against disobedient or recalcitrant parties or their attorneys or both" (Advisory Committee Note to Rule 16's 1983 Amendment), was based on the repeated failure by defendants and their counsel to meet their obligations to plaintiff and this Court in carrying the litigation forward.[1]

In early September 1984 the case went to trial before a jury on the issue of damages alone. Following three days of testimony, the jury returned a verdict in varying amounts:

1. against Robbins, $34,000 in lost wages and $14,842 in interest;

2. against Frierson, $125,000 in compensatory damages for physical, mental and emotional injury and $100,000 in punitive damages;

3. against Smith, $250,000 in compensatory damages for physical, mental and emotional injury and $100,000 in punitive damages; and

4. against Frierson and Smith jointly and severally, $3,300 in compensatory damages for legal and medical expenses.

All defendants have now moved in the alternative for judgment notwithstanding the verdict under Rule 50 or for a new trial under Rule 59. Frierson and Smith have also moved under Rule 60(b)(6) to vacate the April 23, 1984 default judgment as to liability. For the reasons stated in this memorandum opinion and order, all defendants' motions are denied.

---

1. Opinion, 101 F.R.D. at 541–42 details the extent of those delinquencies at distressing and depressing length, recounting defendants' re-peated failures and refusals to answer discovery and to comply with monetary sanctions or other court orders compelling discovery.

### Facts [2]

■ Coleman, a Robbins police officer since 1948, left fulltime service in 1970. Between 1970 and December 1, 1977 he continued to be employed by Robbins as a peace officer for special projects assigned to him on account of his experience and expertise. In that capacity Coleman had the duties and powers of a sworn police officer, including authority to carry a weapon. On December 1, 1977 the Robbins Board of Trustees ("Board") appointed Coleman to the post of Special Investigator and authorized him to investigate the Robbins police force for corruption. Coleman was furloughed from his police force position to carry out the Board appointment. In the course of his investigation Coleman discovered widespread corruption in which Smith, then Robbins Mayor, was implicated.

In an effort to avoid public scrutiny and any risk of criminal indictment stemming from Coleman's investigation, on March 1, 1978 Smith abolished the Robbins police force and fired Coleman from his job as Special Investigator. Smith sought no authorization from Board for either act. Despite the fact his salary had been cut off, Coleman continued to carry out his responsibilities as Special Investigator, reporting the results of his investigation to both Board and the Cook County State's Attorney in April 1978.

In November 1978 Board renewed Coleman's appointment as Special Investigator. Smith, however, refused to sign the resolution and ordinance renewing Coleman's appointment or to issue a permit identifying Coleman as a police officer and authorizing him to carry a gun. At about the same time Smith and unknown others destroyed records relating to Coleman's original appointment as Special Investigator and his investigation of police force corruption.

Either in late 1978 or early 1979 the Robbins police department was reestablished. Frierson, a Cook County Deputy Sheriff who had held helped patrol Robbins during the period it was without a police department, was named Chief of Police. During 1979 as many as half the former members of the police force were rehired. Coleman, however, was not rehired, even though he had served longer than any other peace officer in Robbins history and his salary as Special Investigator had not been paid since Smith fired him in March 1978.

In April 1979 [3] an individual doing business in Robbins complained to Coleman that Frierson had been applying pressure to obtain free services for Robbins police officers. Coleman investigated the complaint and reported his findings to the Board, which in turn reprimanded Frierson. On June 22, 1979 Coleman was arrested and charged with wrongfully impersonating a police officer. Coleman believes Smith and Frierson conspired to direct that arrest in retaliation for his investigation into their alleged wrongdoing. In July 1979 the charge against Coleman was dismissed by a Cook County Circuit Court judge.

At the damages trial Coleman offered evidence to prove that as a result of Smith's and Frierson's conduct—in particular the firing of Coleman from his job as Special Investigator, his arrest and prosecution and the failure to reinstate him as a peace officer—he suffered substantial mental, emotional and ultimately physical harm. In addition he sought damages for lost wages (except from Frierson) and for

---

**2.** Entry of a default against a defendant is taken as an admission that the factual allegations of the complaint are true. If those allegations are sufficient to establish the defendant's liability, a judgment as to liability may be entered without further proofs. See 10 Wright, Miller & Kane, *Federal Practice & Procedure: Civil* § 2688, at 444–48 (1983). Because the Opinion entered judgment as to liability against defendants on the basis of Coleman's Complaint alone, the established facts are those Coleman alleged there. That is the basis on which the text's summary of the factual background of Coleman's claims is framed.

**3.** This was after the reestablishment of the police department and while Coleman was still serving as Special Investigator (without salary and despite Smith's refusal to sign the November 1978 ordinance appointing him).

medical and legal expenses (except from Robbins) incurred as a result of defendants' conduct.

### Smith's and Frierson's Motions To Vacate

Both Smith and Frierson seek relief from the April 23, 1984 default judgment under Rule 60(b)(6), which authorizes the court to relieve a party from a final judgment for any justifiable reason not otherwise mentioned in Rule 60(b). *C.K.S. Engineers, Inc. v. White Mountain Gypsum Co.*, 726 F.2d 1202, 1206 (7th Cir.1984) recently set out the standard applicable in Rule 60(b) cases:

> [R]ule 60(b) is applied liberally in the default context only in the exceptional circumstance where the events contributing to the default judgment have not been within the meaningful control of the defaulting party, or its attorney. Although a default judgment is a harsh sanction and the law does favor trials on the merits, these considerations must be balanced against the need to promote efficient litigation and to protect the interests of all litigants. Accordingly, the decisions of this circuit reflect the notion that the district court must have the default judgment readily available within its arsenal of sanctions "in order to ensure that litigants who are vigorously pursuing their cases are not hindered by those who are not." *Stevens v. Greyhound Lines, Inc.*, 710 F.2d 1224, 1230 (7th Cir.1983). In order for the default judgment to be an effective deterrent against irresponsible conduct in litigation, relief from a default judgment under rule 60(b) must be perceived as an exceptional remedy.

■ Measured against that standard, it is an understatement to say Smith and Frierson's request for relief is unpersuasive. As Opinion, 101 F.R.D. at 541–43 made plain, the failures leading up to the default judgment were both numerous and egregious. This Court made every effort to apply less drastic sanctions, but defendants remained delinquent (often intransi-

gent) in meeting their responsibilities. Given that background, Smith and Frierson must identify exceptional circumstances indeed in order to warrant relief under Rule 60(b)(6). To that end they make two arguments:

1. Aldus Mitchell ("Mitchell"), counsel for all defendants before filing of the present motion, is exclusively to blame for the misconduct giving rise to the default judgment. Smith and Frierson were not aware of Mitchell's misconduct and should not be held accountable for it.

2. Mitchell's representation of Robbins as well as of Smith and Frierson gave rise to a conflict of interest warranting relief from the default judgment under the rationale of *Dunton v. County of Suffolk*, 729 F.2d 903, *modified on other grounds*, 748 F.2d 69 (2d Cir.1984).

Neither argument is sufficient to justify Rule 60(b)(6) relief under *C.K.S. Engineers*.

■ Both *Ben Sager Chemicals International, Inc. v. E. Targosz & Co.*, 560 F.2d 805, 810–11 (7th Cir.1977) and *Inryco, Inc. v. Metropolitan Engineering Co.*, 708 F.2d 1225, 1233–34 (7th Cir.1983) expressly reserved ruling on whether a lawyer's gross negligence constitutes an extraordinary circumstance warranting Rule 60(b)(6) relief for a client against whom a default judgment has been entered. As *Inryco*, 708 F.2d at 1233 framed the issue:

> On the one hand, courts hesitate to punish a client for its lawyer's gross negligence, especially when that lawyer affirmatively misled the client. On the other, as Justice Harlan noted for the Supreme Court in *Link v. Wabash R.R.*, 370 U.S. 626 [, 633–34, 82 S.Ct. 1386, 1390, 8 L.Ed.2d 734] ... (1962), if the client freely chooses counsel it should be bound to counsel's actions.

Yet on the facts in *Inryco* our Court of Appeals found no need to negotiate a path between those competing considerations (*id.* at 1234):

> The defendants here were not diligent in pursusing this case and therefore would not prevail even if gross negligence qual-

ified as another Rule 60(b) ground for relief, because courts allowing such relief uniformly require a diligent, conscientious client. Affidavits submitted by the defendants showed that they failed to follow the progress of the case and failed to regularly inquire of their lawyer or the court as to the case's current status.... In the twenty months between the filing of the complaint and the default judgment, defendants contacted [counsel] fewer than half a dozen times, and at no time knew the precise procedural status of the case. Moreover, our thorough review of the record reveals that [counsel] did not actually mislead the defendants. The district court found that the defendants apparently neither specifically asked [counsel] how the lawsuit was progressing nor found out for themselves.

The defendants' neglect precludes Rule 60(b)(6) relief.

That passage might well have been written to describe Smith and Frierson. Post-trial depositions of those defendants make it plain they both took minimal interest in the progress of the lawsuit from its inception. For example, asked about his response to receiving Coleman's summons and complaint, Smith answered (Smith Dep. 15–16):

A. The first thing I did, nothing.

Q. What was the next thing you did?

A. The next thing I did, it was nothing.

Q. Who was the first person that you talked to or talked to you or communicated to you in some way related or with regard to the suit?

A. Black [Mitchell's former law partner], I guess, was the first one who communicated with me regarding—not Black, Mitchell.

Q. So you didn't call anybody, you didn't call any lawyers, you didn't call anybody to say what is this?

A. No, I wasn't in office, and so I didn't worry about it.

Frierson did respond to receipt of Coleman's summons by calling the Robbins Village Hall, which in turn referred him to Mitchell (Frierson Dep. 22–23). Frierson's subsequent attention to the lawsuit, however, evinced little more diligence than Smith's (Frierson Dep. 57–59):

Q. Did you ever ask Mr. Mitchell or the people in his office what he was doing to investigate that case that had been filed against you?

A. No, I did not.

Q. Did you ever suggest that he go out and dig up the evidence?

A. No, sir, I did not.

Q. Did you ever ask him what he had done?

A. No, I did not.

[There then follow an entire series of questions as to whether Frierson ever looked into any aspects of the claim or possible defenses, each eliciting a simple "No" response. They concluded with the following two.]

Q. Did you ever ask [Mr. Mitchell] what the legal issues that would be involved in the case were?

A. No.

Q. Did you ever ask him to explain the law that Mr. Coleman was relying on in his complaint?

A. No.

Nor did that level of disinvolvement change during the course of the litigation. Neither Smith nor Frierson even monitored the case closely enough to know a default judgment had been entered as to liability—this in the face of the repeated delinquencies recited in the Opinion, which any reasonable person in their circumstances had to know about—and their trial would be (and was) limited to the issue of damages. Such inattentiveness to the progress of the lawsuit might well be inexcusable were Smith and Frierson utter neophytes to the litigation process—but it is certainly so given that both defendants, by virtue of their backgrounds and personal experience, had been exposed extensively to the world of lawyers and lawsuits. Their depositions disclosed each to have been experienced in

litigation matters—far more sophisticated than the uninformed one-time litigant.

Nor does it appear from the record that Mitchell affirmatively misled Smith and Frierson as to the status of the case. Though Mitchell was less than diligent, or perhaps even negligent,[4] in communicating with his clients, there is no evidence he actively misrepresented affairs in the face of an inquiry from either defendant. Perhaps a neophyte might reasonably be lulled into a false sense of security about his situation were his lawyer to behave as Mitchell did, but again Smith and Frierson were not naive actors.

In short Smith and Frierson were not in *Inryco* terms diligent and conscientious clients, so they are not entitled to relief under Rule 60(b)(6) on account of Mitchell's claimed negligence in his conduct of their case. That does not mean, however, they are entirely without a remedy. Mitchell, after all, had a duty to represent Smith and Frierson conscientiously and zealously. To the extent the judgment against them may be attributable to Mitchell's default in that duty, they may seek to recover any consequent losses by means of a malpractice action against Mitchell. But they may not shift the burden of Mitchell's default as to them onto Coleman, especially because Mitchell's conduct was reasonably within their control. See *C.K.S. Engineers*, 726 F.2d at 1206.

■■■■ Next Smith and Frierson contend the existence of a conflict of the sort described in *Dunton* qualifies as a "reason justifying relief from the operation of the judgment" for purposes of Rule 60(b)(6). That argument's strength depends in substantial part on the scope of the Second Circuit's holding in *Dunton* and its force in this Circuit. Smith and Frierson seem to argue *Dunton* stands for the proposition that whenever a Section 1983 suit is brought against both (1) an individual municipal officer and (2) his or her employing municipality under *Monell v. New York City Department of Social Services*, 436

U.S. 658, 691–92, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978), and whenever both the individual and the municipality are represented by the same counsel, a conflict of interest exists. And that conflict, they claim, fatally taints any court proceedings that take place during the period of the common representation.

But as this Court suggested earlier this month in *Clay v. Doherty*, 608 F.Supp. 295, 304–05 (N.D.Ill.1985), there is no clear basis for reading *Dunton* as creating a universal per se conflict rule—particularly in light of the actual and egregious nature of the conflict mandating a new trial in that case. Rather *Dunton* should be read as reasserting "the need for sensitivity to the risk of conflict throughout the course of a lawsuit involving multiple representation" (*Clay*, at 305), especially in cases—like those proceeding under *Monell*—where the differing interests among clients may not be immediately apparent. Whenever an actual conflict may fairly be said to have arisen, then the judge and the parties have the joint responsibility to guard any threatened interests. *Clay, id.*; see *Dunton*, 729 F.2d at 908–09.

*Dunton, id.* at 907 does include the apparently broad statement:

> After *Monell* the interests of a municipality and its employee as defendants in a Section 1983 action are in conflict.

But that statement must be viewed in the context of the *Dunton* facts and the sentence that immediately precedes the quoted one:

> [S]ince the Supreme Court's decision in *Monell* [citation omitted], municipalities can be held liable under section 1983 for employees' actions taken pursuant to municipal policy.

In *Dunton* the immediate cause of plaintiff's injury was the conduct of the individual county police officer. Any county liability would be derivative of that officer's individual conduct in the sense plaintiff had

---

**4.** This opinion of course makes no decision in that respect as between Mitchell and his clients.

As the text suggests, that may be an issue for another court to resolve.

to demonstrate the officer was acting pursuant to a county policy or custom. See *Monell*, 436 U.S. at 691–92, 98 S.Ct. at 2036. Thus the county could escape liability by proving the individual defendant was acting outside the scope of his official duties, rather than pursuant to a county policy or custom. Indeed in *Dunton* just such an argument was made on the county's behalf by the lawyer who at the same time represented the police officer.

But *Monell*'s holding that a local government is a "person" for Section 1983 purposes (*id.* at 690, 98 S.Ct. at 2035) also created the potential for a direct action against such an entity for its own civil rights violations, not only for those derivative of an individual officer's conduct. Action by a city council or county board in violation of a plaintiff's civil rights can give rise to such a direct action without providing the basis for a suit against individual defendants. By the same token, a plaintiff may sue an individual officer under Section 1983 without also asserting a *Monell* claim against the relevant governmental entity. Where such distinct claims against a local government and its employee are asserted within the same action, representation of both defendants by the same counsel generally does not pose the likelihood, much less the actuality, of conflict that triggered the *Dunton* decision and language.

In that light, Smith and Frierson's invocation of *Dunton* in support of their Rule 60(b)(6) motion fails for two reasons. First, Coleman's claim against Robbins was not dependent on the claimed individual misconduct of Smith and Frierson. As this Court said in an earlier opinion in the case (556 F.Supp. 460, 463 (N.D.Ill.1983) (footnote omitted)):

> *Monell* ... teaches a municipality can be liable for unconstitutional actions of its employees that implement an official custom or policy. Complaint ¶¶ 38–39 recite the magic words, and this Court might ordinarily regard them as sufficient to tar Robbins with the brush of Smith's and Frierson's retaliatory actions. *See*

*Thompson v. Village of Evergreen Park*, 503 F.Supp. 251, 252 (N.D.Ill.1980). Here, however, the formula recital is specifically negated by Complaint ¶¶ 14, 16–17 and 21, which dissociate Smith's and Frierson's actions from those of the Board. Accordingly the Complaint fails to state a Section 1983 claim against Robbins for Smith's and Frierson's retaliatory actions, the termination or the unlawful arrest.

Indeed, Robbins' liability to Coleman is based solely on a due process claim deriving from its having rehired police officers with less seniority, while not rehiring Coleman. That claim does not implicate Smith and Frierson, just as the claims against the two of them do not implicate Robbins. That disparity in the claims is evident from the instructions given the jury, and certainly from the sharply differing awards of damages. In short, defendants' situation simply does not give rise to *Dunton*-type conflict.

Second, even if Mitchell's representation of both Robbins and the individual defendants were perceived as creating a *risk* of conflict, nothing suggests such a conflict was ever *realized*. Smith and Frierson identify only one specific instance of conflict in Mitchell's handling of the case. In late 1983, they claim, Coleman offered to settle this lawsuit for $30,000 and the issuance of credentials to Coleman. Though Mitchell notified Robbins of the offer, he failed to give Smith and Frierson notice—a failure they attribute to Mitchell's primary allegiance to Robbins. Without a doubt Mitchell should have told Smith and Frierson of the offer, but there is little to suggest his failure to do so reflects a conflict of interest. For one thing, no reason has been suggested for Robbins' having any less interest in declining the settlement offer than would Smith and Frierson. Certainly nothing in defendants' respective legal positions indicates as much. Neither Smith nor Frierson has indicated he had any interest in such a settlement offer. In fact Frierson said categorically that even had he been told of the offer he would have rejected it (Frierson Dep. 96). Finally,

Robbins' concurrence in the purported settlement offer was a sine qua non (Smith and Frierson could not of course deliver the police credentials that were an integral part of the claimed proposal). In sum, Smith and Frierson have not shown themselves adversely affected by Mitchell's failure to inform them of the asserted settlement offer.

Mitchell did testify, in deposition, he was particularly sensitive to whether or not Robbins was satisfied with his handling of the case (Mitchell Dep. 39–40). That attitude could hypothetically have generated less zealous advocacy on behalf of Smith and Frierson than of Robbins. But no facts on the record suggest Mitchell indulged that preference to Smith's and Frierson's detriment. On the contrary, Mitchell appears to have been indiscriminate in his neglect of his clients' interests, with the result that a default judgment was entered against them all.

Smith and Frierson have not established they are entitled to the "extraordinary case" relief available under Rule 60(b)(6). Their motion to vacate the April 23, 1984 default judgment is denied.

### Motion for Judgment Notwithstanding the Verdict

Defendants' motion for a judgment n.o.v. —in effect a motion to vacate the default judgment on the merits—asserts three grounds:

1. Coleman's claims are barred by res judicata principles because they could have been raised in the context of his lawsuit against Robbins for unpaid wages, filed in the Circuit Court of Cook County in March 1980. There, claiming to have served as Special Investigator for a period of 107 weeks at a salary of $225 per week, Coleman sought a judgment of $24,000. That action was terminated January 29, 1982 when the parties filed a stipulation to dismiss the cause with prejudice.

2. Coleman's factual allegations in the Complaint, deemed admitted as a consequence of the default judgment, are insufficient to state a claim upon which relief can be granted.

3. Coleman had no property or liberty interest in his employment, either as Special Investigator or as a part-time police officer. Robbins was therefore not required to afford him a pre-termination hearing. Under prevailing law, his due process rights were adequately guarded by the availability of an adequate state remedy.

But the short answer is that this Court need not consider the merits of those contentions at this late stage of the litigation, though different reasons for that answer attach to the differing attacks.

■ Defendants' first argument is an affirmative defense to liability, essentially asserting defendants (though otherwise liable) are not subject to suit because of facts outside the Complaint. Ordinarily such a defense must be pleaded in a defendant's answer to the complaint. At the least it must be raised by motion at trial. See 5 Wright & Miller § 1277, at 328–29, 332; *id.* at § 1278. In any event such a defense may not be raised for the first time after judgment has been entered and the record in the case established. See *Johnson v. Rogers,* 621 F.2d 300, 305 (8th Cir.1980) (defense of res judicata may not be raised for the first time in a motion for judgment n.o.v.). Clearly the strong policy in favor of certain and final judgments on the merits compels such a rule.

■ Defendants' second argument is of the variety normally and properly raised in a Rule 12(b)(6) motion. In that regard Judge Weinfeld said for a three-judge court in *Snead v. Department of Social Services of the City of New York,* 409 F.Supp. 995, 1000 (S.D.N.Y.1975) (emphasis in original):

> If, as stated in *Bell v. Hood,* [327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946),] "the failure to state a proper cause of action calls for a judgment on the merits," then a litigant should not be permitted to raise such a failure after a determination on the merits. This view finds support in Rule 12(h)(2) of the Fed-

eral Rules of Civil Procedure, which provides that "[a] defense of failure to state a claim upon which relief can be granted ... may be made in any pleading ... or by motion for judgment on the pleadings, or at trial on the merits." The clear thrust of the Rule is that a failure to state a claim may be raised at any time *before* a disposition on the merits but not *after.* Any other construction would not only add to intolerable delay, but create uncertainty as to the validity of a final judgment on the merits.

See also 5 Wright & Miller § 1392, at 861–62 (1969 & Supp.1984).

▆▆▆ Defendants' third argument is not technically an affirmative defense (for it challenges one of the elements of Coleman's cause of action, rather than acknowledging the validity of the claim as pleaded by plaintiff but urging its defeat because of other factors; see Rule 8(c)), nor is it strictly speaking a Rule 12(b)(6) contention (for it asserts facts outside the Complaint itself; see the last sentence of Rule 12(b)). But the same reasoning applies. See *Breuer Electric Manufacturing Co. v. Toronado Systems of America, Inc.*, 687 F.2d 182, 186 (7th Cir.1982). Once the record in the case has been made at or before the trial on the merits, every principle of orderly jurisprudence forbids an assault on the judgment for reasons dehors the record—unless of course any of the bases for post-judgment attack under Rule 60(b) applies. Defendants do not even hint at a right to relief under that Rule, so far as the three grounds discussed in this section are concerned.

In both legal and practical contemplation a default judgment is the equivalent of a trial on the merits. That makes all the foregoing reasoning fully applicable here. Between the time Coleman filed the Complaint and the time the default judgment was entered nearly a year and a half elapsed, affording defendants ample time to have raised the arguments they only now put forward. If defendants could not with reasonable diligence have discovered the factual predicate for those arguments,

the principles embodied in Rule 60(b) might perhaps compel a different analysis. But in the absence of such a showing—and defendants have made none—the default judgment as to liability must be seen as the analogue of a judgment on the merits. Its entry foreclosed arguments challenging the sufficiency of Coleman's claim for relief. Any other result would effectively allow defendants the opportunity now to press arguments they wholly neglected to advance, for no excusable reason, when they should have. Doing justice between litigants, after all, hinges as much on respect for the procedural rules governing the progress of the lawsuit as on affording parties liberal scope in making their arguments on the merits.

### Motion for a New Trial

Defendants' motion for a new trial, like their motion for judgment n.o.v. and like their conduct of the trial on damages, is in substantial part an effort to raise liability questions foreclosed by the April 23 default judgment. Those portions of the new trial motion may not now be raised for the reasons set out in the preceding section of this opinion.

Defendants have pointed, however, to some items that do reflect on the conduct and result of the damages prove-up. Those matters, of course, are properly to be considered on the motion for a new trial and must be addressed specifically.

### 1. *Evidentiary Matters*

Defendants point to four assertedly erroneous evidentiary rulings that, they claim, so tainted the proceedings as to require a new trial:

1. Leon Smith ("L. Smith"), a fireman for Robbins, should have been allowed to testify as to Coleman's physical condition based upon his visits to Coleman's house after February 1982 to empty water from Coleman's water holding tanks.

2. Coleman's medical records were admitted into evidence without proper authentication.

3. Certain testimony of Smith and Frierson bearing on their motives for acting as they did was improperly excluded.

4. Evidence that Smith voted against the termination of Frierson as Chief of Police by the Robbins Board was improperly admitted.

These matters require only brief treatment.

■■■ L. Smith came as a surprise witness at trial. His name had not appeared on defendants' witness list furnished before trial, and his testimony was not necessary to prevent manifest injustice. See Rule 16(e). Certainly the jury had ample basis to assess Coleman's physical condition, particularly given that Dr. Fabian Gotsis (another witness who had not appeared on the pretrial list) *was* permitted to testify as to his knowledge of Coleman's condition. Modern trial practice, with its emphasis on the avoidance of surprise and the full opportunity to discover the other side's theories and their factual support *before* trial,[5] properly places an important premium on full advance preparation and disclosure. Defense counsel's preparation of his case did not conform to that standard, and Coleman's counsel were right in objecting to L. Smith's testimony. Coupling those facts with the lack of prejudice to defendants, this Court concludes the exclusion of L. Smith's evidence provides no basis for a new trial.

■■■ As for the medical records, Coleman's counsel correctly points out they were not introduced by Coleman but rather by defendants in their cross examination of Coleman's medical expert. During the course of that cross examination, large portions of the reports were read to the jury. Defense counsel also used the reports in cross examining Coleman's wife and in direct examination of Dr. Gotsis. With defendants' counsel having taken the lead in making use of the reports and having read large portions of them to the jury, defendants cannot fairly object to admission of the documents themselves, especially because Dr. Gotsis, a defense witness, adequately identified the records during the course of his testimony.

■■■ Smith and Frierson sought to testify as to the motives behind their conduct. Smith wished to testify that his understanding of applicable law formed the basis of his refusal to issue an appointment certificate to Coleman. Frierson sought to explain he had acted as he did with regard to Coleman on the advice of attorneys. In both instances, of course, the proposed testimony was designed to establish that both Smith and Frierson acted in good faith. But the question of good faith was foreclosed by the default judgment as to liability—a judgment that included the fact of their having acted out of malice (and hence not in good faith). Their proposed testimony was properly excluded.[6]

■■■ Finally the testimony admitted as to the Robbins Board's termination of Frierson did not address the circumstances of such termination in any detail, but was rather limited to the fact Smith had voted against termination. Admission of that testimony followed direct testimony by Smith that he did not vote on Board matters except to break a tie. Coleman sought to rebut that direct testimony, thus calling Smith's credibility into question. Moreover the same evidence bore on Smith's assertion that he and Frierson never conversed with one another about Coleman, for Frierson's termination was a result of Coleman's arrest. In short, the evidence was not beyond the scope of direct examination, nor was it inadmissible under Fed.R.Evid. 403.

---

5. This is in sharp contrast to the old cards-close-to-the-vest or "fox hunt" theory of litigation.

6. Defendants also sought to introduce testimony of present Robbins Mayor Richard Ballentine ("Ballentine") to the effect that Elbert Johnson ("Johnson") had told Ballentine in 1981 that Coleman talked constantly about becoming Chief of Police. That testimony was properly excluded as hearsay. And Ballentine's testimony that he had ordered the Robbins Fire Department to deliver water to Coleman's home was simply irrelevant.

## 2. *Closing Argument*

Defense counsel argues this Court interrupted his closing argument to emphasize that the "facts were as established by the Court," yet when he objected to a statement of facts made by Coleman's counsel in the course of closing argument, this Court ruled that the jury could determine the truth of the factual assertions. This Court's comments, defense counsel urges, improperly prejudiced defendants in the minds of the jurors.

That argument misunderstands—yet again—the effect of a default judgment. Entry of the default against defendants precluded them from contesting the facts alleged in the Complaint. Despite that defendants tried repeatedly during the trial to challenge the conclusiveness of those facts—an effort they have renewed in their post-trial motions. When defense counsel began to contest the established facts in closing argument, this Court was compelled to interrupt to make plain to the jury the posture of the case at trial. To do otherwise would have misled the jury as to its function in the case.

By sharp contrast, the statements of fact by Coleman's counsel during closing argument, to which defendant's counsel objected, related to the *evidence* the jury itself had heard. Whenever—in any jury case—counsel states his or her recollection of the evidence and opposing counsel objects to that recollection as an inaccurate statement, this Court's invariable practice (unless the lawyer's statement is a flatout mischaracterization of a discrete fact, as confirmed by this Court's trial notes) is to remind the jury that *it* is the trier of fact, that what the lawyers say is not evidence and that if the jurors' collective recollection differs from what the lawyers have said, it is the jurors' determination that controls. That practice, which involves neither sustaining nor overruling such an objection during closing argument, echoes the explanation that "what the lawyers tell you is not evidence," invariably given *before* closing arguments begin, and the comparable jury instruction, always given after closing arguments are completed.

Defense counsel thus mixes apples with oranges in complaining of disparate treatment. Neither of this Court's different kinds of statements to the jury, nor the two kinds together, was or were prejudicial to defendants.

## 3. *Sufficiency of Evidence To Support the Verdict*

Defendants finally claim they are entitled to a new trial because there was insufficient evidence to support the size of the jury's award. That claim asks this Court to balance various considerations in light of the facts and the posture of this case. As 11 Wright & Miller § 2806, at 49 (footnotes omitted) puts it:

> On the one hand, the trial judge does not sit to approve miscarriages of justice. His power to set aside the verdict is supported by clear precedent at common law and, far from being a denigration or a usurpation of jury trial, has long been regarded as an integral part of trial by jury as we know it. On the other hand, a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter.... If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial.

Applying that standard to a review of the evidence as a whole, this Court cannot say the jury's estimate of Coleman's damages was mistaken. There was clear evidence Coleman has suffered multiple strokes and the quality of his life has been significantly impaired. Moreover there was credible expert testimony, never significantly undermined either on cross examination or by contrary direct evidence, to establish the events occurring between November 1977 and Coleman's arrest and

prosecution in 1979 as a proximate cause of those physical injuries. There was also substantial evidence linking defendants' conduct, in proximate cause terms, to severe mental and emotional distress on Coleman's part. As for the pay award against Robbins, substantial evidence supported Coleman's having been appointed to the position of Special Investigator for a four-year term. Finally the punitive damages award is warranted, malice on the part of Smith and Frierson having been conclusively established by the default judgment, and the jury having evaluated Coleman's compensatory damages as it did. It also bears noting in that regard that the claims against Smith and Frierson implicate breaches of public trust as well as injury to a single individual. See *Zarcone v. Perry*, 572 F.2d 52, 56–57 (2d Cir.1978). On the record, this Court has no basis for setting aside the jury's award.

### *Conclusion*

This case has been much protracted and overcomplicated by the careless, dilatory and often obstructionist conduct of defendants through their counsel. It is not for this Court to apportion fault as between counsel and defendants themselves. If and to the extent the consequence of that fault has been a verdict against defendants that otherwise might not have been, defendants must bear that consequence or look to their counsel for restitution. They may not impose the cost of delinquencies on their side of the lawsuit by putting Coleman to the task of relitigating a case he had sought to prosecute (in the face of continuing obstacles) since 1982.

Smith's and Frierson's motions to vacate are denied. All defendants' post-trial motions—for judgment notwithstanding the verdict and in the alternative for a new trial—are also denied.