WILLCO KUWAIT (TRADING) S.A.K.

v.

Peter J. DeSAVARY.

Civ. A. No. 83–0590B.

United States District Court,
Rhode Island.

June 25, 1986.

Paul M. Brown, Gary D. Rosenthal, Whitman & Ransom, New York City, Robert Lovegreen, Gidley, Lovegreen & Sarli, Providence, R.I., for plaintiff.

Richard Sharfman, James A. Shanman, Sharfman, Shanman, Poret & Siviglia, New York City, Michael S. Schwartz, Mandell, Goodman, Familgetti & Schwartz, Providence, R.I., for defendant.

## OPINION

FRANCIS J. BOYLE, Chief Judge.

Plaintiff, Willco Kuwait (Trading) S.A.K., sued Defendant Peter J. DeSavary alleging securities and common law fraud in the negotiation of a sales contract between the parties. Defendant counterclaimed seeking damages for breach of the contract. The action was tried to a jury and the jury returned a verdict for Defendant on Plaintiff's claim and a verdict of $25,300,000 for Defendant on his counterclaim. The jury apparently concluded that Defendant was entitled to $20,000,000 as money owed under the contract and $5,300,000 in consequential damages. Plaintiff has moved for a judgment notwithstanding the verdict and for a new trial on Defendant's counterclaim and for a new trial on its own claim. After extensive briefing, the Court heard argument. It denied Plaintiff's motion for judgment N.O.V. in all respects except one; the Court reserved decision on Plaintiff's claim that the jury verdict was excessive. The Court also reserved decision as to Plaintiff's motion for a new trial. For reasons detailed below, the Court denies the remainder of Plaintiff's motion for judgment N.O.V. and grants Plaintiff's motion for a new trial, unless Defendant agrees to a $5 million remittitur.

### I.

The evidence can be summarized as follows. Defendant Peter J. DeSavary, an English businessman, and the principals of Willco Kuwait (Trading) S.A.K. had had dealings before they entered into the contract out of which this dispute arises. Plaintiff's version is that during a seven year period before the instant transaction, DeSavary would present business proposals to Willco and Willco would participate with almost complete reliance upon DeSavary's recommendations. Competent evidence was also presented, however, that prior deals between the parties had not proceeded with such unquestioning trust. Hussein Elbaz, Willco's former managing director, had testified at deposition that he felt DeSavary had lied with respect to other transactions. Omar Alyagout, the current chairman of Willco, testified that Willco was "failing with Mr. DeSavary" in other projects and that he did not believe any project including this one offered by DeSavary.

In early June 1981, Mr. DeSavary called Mr. Elbaz and offered Willco participation in a Texas oil refining company known as Independent Refining Corporation ("IRC"). At the time, DeSavary was negotiating for the purchase of IRC. Willco was interested in Mr. DeSavary's proposal because it would enable Willco to become an integrated oil company, providing a market for crude oil which it bought and sold and meeting the requirements of potential customers who had previously declined to deal with it.

Mr. Elbaz and Mr. Peter Bertelson, as representatives of Willco, visited the IRC facilities in Houston, Texas in late June 1981. Plaintiff admits that Mr. Elbaz and Mr. Bertelson spent several days looking at the IRC facilities. Mr. Bertelson had experience in the oil refining business. The two Willco representatives were accompanied by Dr. Samir Seraphim, an employee of Artoc Investment Management Co. According to Plaintiff's own witnesses, Seraphim was Willco's "eyes and ears" for investments in the United States. He had been an oil industry specialist with Chase Manhattan Bank before he was engaged as a consultant by Willco. At their meeting in Houston, DeSavary and the Willco people entered into a "hand shake" deal for the sale by DeSavary to Willco of a 50% interest in IRC. In connection with this deal, Plaintiff's witnesses testified that DeSavary made numerous misrepresentations and omissions of material fact regarding IRC's financial condition, its status as an operating refining company, the nature of its bank obligations, business and assets, DeSavary's own dealings with IRC's "non-refinery" assets, and DeSavary's ownership of IRC. Before leaving Houston, Elbaz informed DeSavary that Seraphim would be returning to Houston to make an examination of pertinent IRC books and

financial records to confirm what DeSavary had told them. Contrary to Plaintiff's evidence, DeSavary testified that he made a complete and accurate disclosure of IRC's financial position, its history of losses and the nature and extent of its indebtedness.

Seraphim visited IRC in July. Willco now characterizes his investigation as a "limited" one. He was "to determine whether there were any material changes in IRC which were not reflected in the 1980 IRC unaudited financial statements" furnished Elbaz while in Houston in June. The testimony was, however, that he was also investigating possible changes since the 1981 Purvin & Gertz valuation study of IRC, which DeSavary had furnished Willco representatives in June. Seraphim reviewed IRC's financial records, met with department heads, hired Purvin & Gertz to assist in his review and delivered a written report to Willco's board of directors.[1]

On July 19, 1981, DeSavary gave a presentation to the Willco board of directors in Kuwait at their request. Plaintiff asserts that many of the misrepresentations and omissions which were made in June in Houston were repeated during DeSavary's presentation. The evidence was that DeSavary further described the investment opportunity in IRC as a "gift" to Willco. DeSavary testified to again having made accurate and complete disclosure.

Willco and DeSavary entered into a written contract on July 19, 1981. The agreement provided that in exchange for a 50% interest in IRC, Willco would pay DeSavary $25,000,000 plus $5,000,000 in Willco stock. An initial payment of $10,000,000 was due on July 31, 1981. The balance of the purchase price was to be paid on October 31, 1981. The agreement further provided that Willco would secure a $50,000,000 letter of credit facility with a French bank. Plaintiff, through post-trial memoranda, has raised for the first time a provision of the contract which it alleges required DeSavary to remit $5,000,000 to Willco.

Willco paid DeSavary the initial $10,000,000. In late September, Mr. Elbaz and a Mr. Al Mousa from Willco attended a meeting in Houston. Plaintiff's evidence was that at this meeting, Willco representatives learned for the first time of IRC's poor financial condition. By letter of October 25, 1981, Willco expressed its displeasure with learning of the misleading and incomplete nature of the information DeSavary had given them. The letter indicated that Willco had decided not to pay the balance of the purchase price or to participate in raising additional funds for IRC until Willco had investigated IRC fully and was satisfied about the true state of IRC's financial condition.

Plaintiff's version of the facts is that after its October 25th letter, it further investigated IRC, was not satisfied, and ultimately demanded return of its $10,000,000. There was evidence, however, tending to prove that a new project was developing. Defendant offered evidence that in or around November, Willco agreed to provide additional equity financing in connection with the addition of a catalytic "cracker" to the IRC facilities. Willco's own investigation revealed that the addition of a catalytic "cracker" would increase the value of IRC to $250,000,000.

Eventually, Willco refused to go forward with the purchase of an interest in IRC. There was evidence that up until March of 1982 Willco felt the IRC acquisition was a "good deal". Mr. Elbaz admitted to telling the Willco board this on March 25, 1982. Defendant presented evidence supporting an inference that in May 1982, Willco made the ultimate decision not to proceed, not because of fraud by DeSavary, but because it could not obtain Kuwaiti government approval for an increase in its capital. At the May 9 Willco board meeting, Mr. Elbaz stated that its investment in IRC depended upon an increase in capital, and because of its failure to obtain the requisite approval, "the only way in front of us to withdraw from IRC's project would be to apologize."

1. When it came time for trial, neither party was successful in producing him as a witness, and neither party had been able to depose him before trial.

Globally viewed the evidence was that both parties to this transaction were sophisticated and highly successful business people accustomed to dealing in millions of dollars, and, in this instance, each anticipated reaping enormous profits. There was evidence from which it could be concluded that the failure arose not from dishonest dealings, but from market conditions in a volatile worldwide oil market.

## II.

A motion for judgment notwithstanding the verdict is properly granted when, as a matter of law, the facts and inferences reasonably drawn from those facts lead to but one conclusion. *Rios v. Empresas Lineas Maritimas Argentinas*, 575 F.2d 986, 990 (1st Cir.1978). The facts and inferences must point so strongly and overwhelming in favor of the movant that a reasonable jury could not have found against him. *Chedd-Angier Prod. v. Omni Publications Int'l.*, 756 F.2d 930, 934 (1st Cir.1985). The trial judge must view the facts in the light most favorable to the non-moving party and is not permitted to weigh credibility or resolve conflicting testimony. *Rios, supra,* at 989–90.

"A motion for a new trial should be granted only where the court is convinced that the jury verdict was a 'seriously erroneous' result and where denial of the motion would result in a 'clear miscarriage of justice.'" *Chedd-Angier, supra,* at 934 (citing *Coffran v. Hitchcock Clinic, Inc.,* 683 F.2d 5, 6 (1st Cir.1982)). Within the trial judge's discretion, a new trial may be granted because the verdict is contrary to law or against the weight of the evidence, because damages are excessive, because substantial error was made in the admission or exclusion of evidence or the submission or refusal to submit issues to the jury, because substantial error was made in instructing the jury on the law, or because the trial was for some other reason unfair to the moving party. *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940); *Chedd-Angier, supra,* at 934. That the trial judge would have reached a different result or that the evidence supports an opposite re-

sult is not a sufficient basis for a new trial. *Chedd-Angier,* at 934–35. "Where credibility of witnesses is an issue, special care must be taken not to invade the province peculiarly pertaining to the jury." *Rios, supra,* at 990. In addition, only errors of law which prejudice the moving party support the granting of a new trial. *See* Fed. R.Civ.P. 61.

In moving for a new trial on its fraud claims against DeSavary, Willco raises three basic grounds. First, it cites error in the Court's admitting Defendant's statement as to stock ownership. Secondly, Plaintiff claims error in the Court's excluding a) the details of DeSavary's purchase of IRC stock; b) evidence of alleged self-dealing by DeSavary; c) a telex and a report from Dr. Seraphim; d) an affidavit of Omar Alyagout regarding changes in his deposition; and e) evidence regarding DeSavary's disposition of the $10,000,000 initial payment on the contract. Finally, Willco alleges error in the Court's jury instructions on reliance and materiality, in the Court's giving a "missing witness" instruction and in the Court's refusal to give an instruction regarding the failure to produce evidence. With respect to DeSavary's breach of contract claim, Plaintiff argues: 1) that a verdict on the counterclaim is contrary to law due to a failure of consideration; 2) that a verdict on the counterclaim is against the weight of the evidence due to a lack of competent evidence regarding stock ownership; 3) that the jury's award of $5.3 million in consequential damages is against the weight of the evidence; and 4) that a total award of $25.3 million is excessive and against the weight of the evidence. Plaintiff contends that the verdict is excessive because the jury ignored the contract provision allegedly requiring DeSavary to remit $5,000,000. In addition to supporting its new trial motion in part, this argument comprises the remainder of Plaintiff's motion for judgment N.O.V.

## III.

A. The Admission of Evidence of Ownership.

█ Plaintiff argues that it was error to allow Mr. DeSavary to testify that he

owned Peninsular Petroleum B.V., the company that allegedly held the IRC stock. It asserts that the testimony is inadmissible because it is a legal conclusion and because it is improper testimony as to the legal effect of an agreement or the existence of an agency. Defendant correctly points out, however, that evidence that DeSavary owned the IRC stock was first elicited on cross-examination of Mr. DeSavary by Plaintiff itself. There was no motion to strike the testimony. The evidence was therefore admissible for the simple reason that Plaintiff had waived any objection it might have had to the evidence by initially offering it. *See Coleman v. Frierson*, 607 F.Supp. 1566, 1576 (N.D.Ill.1985).

■ Plaintiff further argues that the evidence on the ownership issue was insufficient as a matter of law to rebut the presumption of non-ownership it had established through the introduction of a stock register of Peninsular Petroleum B.V. It argues that the jury should have been compelled to find that DeSavary did not own Peninsular Petroleum and therefore IRC. With respect to Plaintiff's fraud claim, there was no error in this regard. Ownership in fact was not an issue before the jury on the fraud claim. The question was—did Mr. DeSavary represent that he owned the stock knowing he did not or with reckless disregard for whether he did or not. As for the breach of contract counterclaim, the evidence offered by Defendant, namely that he owned IRC because the stockholders of Peninsular Petroleum B.V. held their stock for his benefit, was competent for a number of reasons. First, ownership was not a critical issue, but was rather collateral. In fact ownership on July 19 was not required. The time set for performance was October. On the collateral issue of whether DeSavary owned the stock, his opinion testimony was admissible. *See Sullivan v. Smith*, 570 S.W.2d 197 (Tex.Civ.App.1978). Moreover, he was not simply rendering an opinion. He was explaining the facts of ownership as he knew them to be. Plaintiff argues this testimony was not clear, unimpeached and uncontradicted as was required to rebut

the presumption established. However, outside of the stock register, which did not establish that he did not ultimately own the stock, no contradictory evidence was presented.

B. The Court's Exclusion of Certain Evidence.

■ Plaintiff alleges that the Court's exclusion of evidence regarding DeSavary's purchase of IRC and the purchase price on the ground that it was irrelevant was error. It alleges that the fact that DeSavary had talked down his seller to a relatively low sales price was relevant as some evidence of DeSavary's fraudulent intent. Plaintiff argues that it tends to show knowledge of the poor financial condition of IRC. The Court remains convinced that Mr. DeSavary's shrewd dealing in the prior transaction is wholly irrelevant to a claim arising out of a subsequent sale. Knowledge of a company's poor financial status is but one explanation for a buyer seeking to deal at a lower price. Saving money is the best explanation. In fact, knowledge of a company's poor finances is more likely to discourage a purchase. Moreover, there was substantial credible evidence which tended to show that both Plaintiff and Defendant had similar knowledge regarding IRC's financial condition prior to contracting and foresaw, as it turned out, erroneously, enormous profits. The evidence was that Willco was given a valuation report and took the opportunity to investigate financial changes since the report by sending Dr. Seraphim to Houston shortly before the parties contracted. DeSavary testified to full disclosure and apparently the jury credited his overall testimony. The jury could conclude that the parties were satisfied with the worth of the investment, whatever DeSavary paid for his purchase. Thus, error which may have provided more information regarding DeSavary's knowledge of IRC's finances would likely have made no difference. The Court finds no error in excluding this testimony and even if error was committed, that it was not of substance.

Plaintiff alleges that it was error to exclude evidence that DeSavary was selling IRC's non-refinery assets to satisfy IRC's need for cash and to profit personally. It alleges that this evidence contradicts DeSavary's representation that IRC was about to turn the corner and was therefore relevant. Evidence that DeSavary was keeping some assets for himself, it says, is relevant because it contradicts DeSavary's representations about his involvement in IRC. It further asserts that DeSavary had stressed IRC's non-refinery assets as a selling point and evidence that these assets were being sold establishes a misrepresentation. Finally, Plaintiff argues that this evidence goes to DeSavary's knowledge and intent.

■ Plaintiff admitted at the bench during trial that it had no evidence that DeSavary was seeking to sell or selling the assets for less than fair market value. Thus, to the extent that Plaintiff argues that DeSavary's selling of the assets tends to show fraudulent intent or some improper relationship between DeSavary and IRC, the argument lacks a necessary foundation. Exchange of assets for cash of fair value certainly would not deplete the corporate asset value. The argument that the information evidences a misrepresentation as to the financial condition of IRC is similarly rejected. Ample evidence existed from which the jury could have found accurate disclosure of IRC'S financial condition or alternatively full investigation by Willco and therefore no reliance on the information furnished. Finally, Plaintiff's own witnesses testified that it did not consider the non-refinery assets in deciding to purchase an interest in IRC. To the extent that a misrepresentation of the holdings of IRC could have been established, it was immaterial as a matter of law. *See Panter v. Marshall Field & Co.*, 646 F.2d 271, 281 (7th Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981).

■ The Court finds no merit in Plaintiff's argument that the Seraphim telex and report were admissible. The telex and report were out of court statements offered for the truth of what was asserted in them and were therefore hearsay. Plaintiff did not offer them for any other purpose. They were not business records because Seraphim was not a Willco employee. They were not admissible on a theory of waiver because they were offered before and not after Defendant testified. Finally, they were not admissible under Fed.R.Evid. 803(24) because Plaintiff gave Defendant no notice of its intention to introduce this evidence under this exception. *See United States v. Atkins*, 618 F.2d 366, 372 (5th Cir.1980).

■ Mr. Alyagout's testimony was presented to the jury by video-tape deposition. Willco had prepared an affidavit which made substantive changes in portions of Alyagout's testimony as it appeared in the typed transcript of the deposition. It sought to introduce the affidavit at trial. It now alleges that the Court committed harmful error because erroneous information was placed before the jury on the "critical" issue of reliance. Alyagout testified in substance that he did not believe in any deal DeSavary presented. Plaintiff now states that Alyagout meant to indicate that he didn't believe DeSavary with regard to the IRC deal only. This was one of the changes he sought to make. The Court finds no error. It was for the jury who saw and heard the witness' testimony to determine what the witness said or meant to say. An additional video-recorded session may have been admissible, but an affidavit of changes in the testimony would have deprived Defendant the opportunity to cross-examine Mr. Alyagout. *See Erstad v. Curtis Bay Towing Co.*, 28 F.R.D. 583, 584 (D.C.Md.1961) (changes in deposition may require further questioning; counsel have right to inquire as to reasons for change and whether changes originated with deponent or his attorney); *see also* 8 Wright and Miller, Federal Practice and Procedure § 2118.

■ The final claim of error regarding the Court's exclusion of evidence concerns the exclusion of evidence regarding DeSavary's disposition of the $10,000,000 initial

payment under the July 19 contract. Defendant claims that evidence that DeSavary put the money in his own pocket rather than putting the money into IRC is some evidence of DeSavary's fraudulent intent. The Plaintiff presented no evidence which established that DeSavary in connection with the sale of IRC stock had any duty to remit the funds in payment to the IRC treasury.

C. The Court's Charge to the Jury.

 Plaintiff first assigns error to the Court's reliance charge. The Plaintiff requested a charge which provided in part that the jury could consider "[T]he defendant's awareness of whether the plaintiff was relying upon their relationship in making his investment decision." The Court instructed, "in your determination of justifiable reliance, you may consider ... whether or not the defendant was informed of the degree of reliance by plaintiff upon his representations." Plaintiff argues that the given instruction fails to highlight for the jury a past relationship of trust and confidence which the evidence clearly showed. It further argues that it imposes upon Plaintiff a burden of proving that it informed Defendant of its reliance. First, evidence of a past relationship of trust and confidence was not clear. In fact, there was contrary evidence. Moreover, the existence of a past relationship of trust and its effect on reliance is more appropriately a matter for argument rather than instruction. Secondly, the language of the instruction imposes no additional obligation on the Plaintiff to prove a communication to Defendant of its reliance. It simply suggests that the jury might consider the Defendant's knowledge in determining whether Plaintiff's reliance was justified, much as Plaintiff's proposed instruction requests.

 With regard to the instruction on materiality, the Plaintiff argues that the charge on "opinion" or "puffing" was both incorrectly stated and not supported by any record evidence. Plaintiff cites the portion of the materiality instruction which states:

... The mere expression of an opinion or puffing does not constitute a basis for a claim of fraud unless the party making such statement has exclusive or superior knowledge of facts inconsistent with such statement.

There was evidence that DeSavary characterized the deal he offered Willco as a "gift." Clearly this could be considered sales talk or puffing. Plaintiff states in its memoranda that an opinion can be an actionable misrepresentation if it is made with knowledge of its falsity or with reckless disregard of its truth. The instruction in substance says this. If anything it establishes a lesser standard for a plaintiff attempting to prove that an opinion is actionable misrepresentation.

 Plaintiff objects to the "missing witness" charge and the failure to give what may be termed a "missing evidence" charge, which Plaintiff requested. Plaintiff suffered no prejudice on either score. Plaintiff's request for an adverse evidence charge stemmed from its contention that DeSavary had failed to produce requested evidence on ownership of Peninsular Petroleum B.V. This is clearly a matter for argument and not a requirement for a specific instruction. The Court's adverse witness charge permitted an argument to the jury that an adverse inference should be drawn from DeSavary's alleged failure to produce witnesses with evidence of his stock ownership. The Court instructed, "If a witness, subject to the control and available to a party, and not available to an opposing party is not produced at trial, either physically or by deposition, then, you may, if you so determine, conclude that that witness' testimony would be unfavorable to the party who could have produced the witness but did not do so." That the argument was not made is not a basis to argue error.

Plaintiff objects to the adverse witness charge because it permitted an adverse inference to be drawn from Dr. Serephim's absence. Plaintiff contends that Dr. Seraphim was equally available to both parties and therefore that the charge was not

proper. If Seraphim was available to De-Savary, an inference against DeSavary was possible. It was for the jury in the first instance to determine which, if any, party Dr. Seraphim was available to. More importantly, DeSavary did not argue to the jury that this particular adverse inference should be drawn and the Court finds no prejudicial error on this basis.

### IV.

With respect to Defendant's counterclaim, Plaintiff first argues that it is entitled to a new trial because due to a failure of consideration, a verdict for DeSavary on the breach of contract counterclaim is contrary to the law and evidence. Plaintiff argues that IRC was not a going concern and had a $40,000 negative net worth at the time of contracting and thereafter. It further argues that DeSavary did not establish ownership of the stock at trial and non-ownership amounts to a failure of consideration. The issue is not whether DeSavary had legal title to all of the stock of IRC in July, 1981, but whether he could deliver title to 50% of the IRC stock to Plaintiff in October, 1981. The evidence supported a conclusion that DeSavary was capable of doing so. As for the consideration DeSavary offered, credible evidence was introduced at trial that the refinery's assets were valued in excess of $100 million and potentially many more million if a "cat cracker" were added. These assets were good consideration and therefore Plaintiff's argument is without merit.

Plaintiff next argues that a lack of credible evidence existed to support a consequential damage award of $5.3 million. This is a credibility issue and the Court must be careful not to upset reasonable jury findings. *Rios*, 575 F.2d at 990. The contract in question required Willco to secure a $50,000,000 letter of credit facility. DeSavary testified that in reliance on this promise by Willco, he paid a French Bank $5.3 million to secure a letter of credit facility for IRC. When Willco failed to perform, DeSavary lost his deposit with the bank. The jury chose to believe Mr. DeSa-

vary in this regard and the Court can not say that the weight of the evidence points the other way.

The final issue raised by Plaintiff is the apparent excess award of $5 million in compensatory damages. The July 19, 1981 contract of the parties provided on page one that Willco was to pay $25 million plus $5 million worth of Willco stock to Peninsular Petroleum, Netherlands Antilles, a DeSavary Company, for a total of $30 million. Ten million dollars was paid in July 1981. An addendum to the contract provided, "Peninsular Petroleum promises to pay immediately US $5 million as directed upon receipt of US $25 million cash and $5 million Willco shares." DeSavary signed this addendum. A further addendum was a letter from Mr. Haddad of Willco to DeSavary which provided in part, "... concerning paying $5 million to me kindly note that this money has to be paid to Willco Kuwait S.A.K. on the due date and this is considered an irrevocable and confirmed letter of credit from my side." DeSavary signed this as well.

The Court instructed the jury that Defendant sought compensatory damages in the amount of $15 million and $5 million worth of stock plus consequential damages. Plaintiff did not object to this. The parties clearly understood the amount then due to be $15 million, including the $5 million stock, not $15 million plus the $5 million stock. Plaintiff had already been paid $10 million. Defendant's counsel expressly suggested this in opening and closing argument in support of his counterclaim. Opportunity now being the mother of invention, Defendant argues that there is no evidence that the $5 million was intended to be paid or indeed whether it was paid, and seeks to rely on the Court's incorrect version of the transaction. Neither party called this error to the Court's attention in spite of the fact that both parties had written drafts of the instructions days before they were given.

This issue relates only to the damages available under the Defendant's counterclaim. It is not in any manner related to

the issue of liability under the July 19, 1981 contract.[2] Thus to the extent a new trial may be warranted, it should be limited to the issue of damages owed by Plaintiff to Defendant. Plaintiff's liability has been established by more than abundant evidence.

The July 19, 1981 writing signed by the parties was presented as the contract of the parties by both Plaintiff and Defendant. The addenda were received in evidence as part and parcel of the agreement (Defendant's Exhibit H). Defendant's counsel has described under oath the document and both addenda as "a true copy of the July 19, 1981 contract" in a post trial affidavit dated February 19, 1986.

Justice requires that a $5 million error be corrected. There has been a clear miscarriage of justice. *Chedd-Angier,* 756 F.2d at 934; *Coffran,* 683 F.2d at 6. Therefore, Plaintiff's motion for a new trial on Defendant's counterclaim on the issue of damages only is granted, unless Defendant files a remittitur in the amount of $5 million within 30 days of the date of this Opinion. *See Linn v. United Plant Guard Workers,* 383 U.S. 53, 65–66, 86 S.Ct. 657, 664–65, 15 L.Ed.2d 582 (1966); 11 Wright & Miller, Federal Practice and Procedure § 2815. If the remittitur is filed, Plaintiff's motion for new trial on the counterclaim is denied. ·

### V.

In sum, Plaintiff's motion for a new trial on its fraud claims is denied. No error prejudicial to these claims was committed at trial. The remainder of Plaintiff's motion for judgment N.O.V. on Defendant's counterclaim is denied. Facts from which a jury could have found damages totalling $25.3 million were presented. However, because the total award on the counterclaim was against the clear and undisputed weight of the evidence, the Court grants a new trial on the counterclaim unless Defendant files a remittitur in writing of $5

**2.** A partial judgment N.O.V. for Plaintiff in the amount of $5 million might have been appropri-

million within 30 days of the date of this Opinion.

ate had the issue been more squarely raised for a more precise consideration by the jury.