**James A. SPENCE, Plaintiff–Appellant,**

v.

**ALLSTATE INSURANCE COMPANY, Defendant/Third–Party Plaintiff– Appellee.**

v.

**Pamela A. SPENCE, Third–Party Defendant–Appellant.**

Supreme Court of Tennessee,
at Nashville.

Aug. 22, 1994.

William Thomas McHugh and Thomas V. White, Tune, Entrekin & White, Nashville, for plaintiff-appellant.

John D. Kitch and John J. Garman, Kitch & Garman, Nashville, for third-party defendant-appellant.

John D. Schwalb, Brewer, Krause, & Brooks, Nashville, for defendant/third party plaintiff-appellee.

## OPINION

DROWOTA, Justice.

In this action to recover under a fire insurance policy, the appellants James Spence and Pamela Spence present several issues for our determination, including: (1) whether the Court of Appeals erred in holding that the "innocent co-insured doctrine" did not apply to this case because of the language in the policy, thereby denying any recovery under the policy to the innocent co-insured—James Spence; (2) whether the Court of Appeals

erred in affirming the trial court's ruling that increased the judgment on the insurance company's indemnity claim against Pamela Spence without her consent; and (3) whether the trial court had jurisdiction to entertain motions filed by James and Pamela Spence pursuant to Rule 60.02(5) of the Tennessee Rules of Civil Procedure while their applications for permission to appeal from the judgment of the Court of Appeals were pending in this Court. For the reasons set forth below, we affirm in part and reverse in part the judgment rendered by the Court of Appeals.

## FACTS AND PROCEDURAL HISTORY

In 1988 James and Pamela Spence purchased a home located at 670 Harding Place in Nashville, Tennessee. At that time, the Spences bought from Allstate Insurance Company a Deluxe Plus Homeowners Policy; the policy listed James and Pamela Spence as the insureds and BancBoston Mortgage Corporation as the mortgagee of the home.

Because of marital difficulties, the Spences separated and Pamela Spence filed for divorce in February 1990. On March 12, 1990, the Spences executed a marital dissolution agreement which provided for the division of their property. They agreed that their three minor children would decide with which parent they wanted to live and that that parent would have possession of the home. The agreement provided that the Spences would continue to own the home as tenants-by-the-entirety and that, if and when the house was sold, they would divide the proceeds equally. The agreement also included a clause which divided the Spences' personal property. That clause provided: "[t]he parties have already divided their household items and personal property to each's satisfaction. Each party will be awarded those items of household furnishings and personal property which is in his or her possession at the time of execution of this agreement." By its terms, the marital dissolution agreement was not to become effective until it was incorporated into a final decree of divorce. Because the children chose to live with James Spence, Pamela Spence moved in with her boyfriend, David Smith, who is now her husband.

On June 8, 1990, James Spence, his son, and a friend of his daughter travelled to South Bend, Indiana, to pick up his daughters, who had been visiting relatives. Before leaving, either James Spence or his son asked Pamela Spence to take care of the home and to feed the dogs while they were in Indiana.

On June 9, Pamela Spence and her boyfriend visited the home. Pamela Spence testified that the house was in disarray; she also testified that she was unable to feed one of the dogs because it was hiding under the bed in an upstairs bedroom. Pamela Spence returned to the home about 9:30 that evening in order to clean the home, and to repeat her attempt to feed the dog. Because she worked the late shift as a dispatcher for the Metropolitan Police Department, Pamela left for work after completing the cleaning tasks. However, she was again unable to feed the dog.

Pamela Spence arrived at the Police Communications Center around 10:30 p.m. Around 4:50 a.m., she left for her "lunch hour." Pamela arrived at her boyfriend's house at 5:10 a.m. and stayed for approximately fifteen minutes. At that time she left his house and returned to the residence at 670 Harding Place to try and feed the reluctant dog; she arrived at the home at approximately 5:30 a.m. This time Pamela was successful in feeding the dog, and after so doing, she returned to work, arriving there between 5:47 and 5:51 a.m.

At 5:51 a.m. the fire department received notification of a fire in the 600 block of Harding Place. Thereafter, it was discovered that the fire was actually in the Spence residence. After the first fire company arrived on the scene at 5:54 a.m., the officer in charge called the Fire Marshal because there was evidence of forcible entry into the home. After arriving on the scene, the Fire Marshal took photographs and began an investigation into the cause of the fire. The next day, a certified fire investigator hired by Allstate conducted an investigation to determine the cause of the fire.

Shortly after the fire, Ray Brashears, the senior staff claim representative of Allstate,

met with Pamela and James Spence. At that time, Allstate gave a $1,500 check to James Spence for temporary living expenses. On July 9, 1990, James and Pamela Spence submitted a "sworn statement in proof of loss" to Allstate for their losses in the fire. This document requested compensation for the loss of real and personal property damaged in the fire; it also included a notarized statement by James and Pamela Spence that neither of them had had anything to do with the fire.

On October 16, 1990, Allstate, by separate letters to James and Pamela Spence, denied the claims. In its letter to Pamela, Allstate explained that its denial was based on its opinion that Pamela Spence, either alone or acting in concert with others, "intentionally set fire to the premises with the intention of destroying same for the purpose of defrauding Allstate Insurance Company." Allstate asserted that Pamela Spence's conduct in setting the fire violated two specific provisions of the insurance policy: the "concealment or fraud" clause and the "intentional acts" exclusion clause.[1] Allstate's denial letter to James Spence was substantially similar, except that Allstate requested James Spence to resubmit a proof of loss for the items of property in which he had a "sole and separable interest from Pamela Spence on the date of the fire."

On November 9, 1990, James Spence resubmitted a proof of loss containing an itemized list of personal property lost in the fire. In the document James Spence described the claimed property as belonging to himself and Pamela Spence, except as subject to the marital dissolution agreement.

On November 28, 1990, Allstate denied James Spence's second claim. In the denial letter, Allstate pointed out that James Spence had admitted in the proof of loss that both he and Pamela Spence had title to the various items of property, subject to the marital dissolution agreement. Allstate then noted that by its terms the agreement did not become effective until a decree of divorce was entered; and it noted that such a decree was not entered until August 22, 1990, some

two months after the date of the fire. Allstate reasoned from these facts that the property was jointly owned as of the date of the fire, and that therefore James Spence had no interest in the property separate from that of Pamela Spence. Because it believed that it was not liable to James Spence for any of the losses incurred in the fire, Allstate refused to advance any additional living expenses to him; it had paid $4,990 as of that time.

On December 27, 1990, James Spence brought an action against Allstate, alleging that it had breached the contract of insurance by denying his claims for the value of the personal property and additional living expenses. Before Allstate answered the complaint, Pamela Spence also filed a lawsuit against Allstate; this action was later consolidated with James Spence's action. Allstate then filed a third-party complaint against Pamela Spence, alleging that she had intentionally set the fire that caused the losses and seeking indemnity from her for any monies that it would have to pay to James Spence. After the initial complaint was filed, but before the case came to trial, Allstate paid the sum of $53,261.40—the estimated cost of repair to the home—to BancBoston Mortgage Company.

The case was tried before a jury in November 1991. The jury returned a verdict in favor of James Spence in the amount of $30,526.10. However, the jury also found that Pamela Spence intentionally set the fire, and it returned a verdict against her and in favor of Allstate in the amount of $4,990 on Allstate's third-party complaint.

Allstate then filed a motion for J.N.O.V. against James Spence, asserting that because of clear language in the insurance policy, there was no material evidence to support the jury's finding that the "innocent co-insured doctrine" applied to his case. Allstate also filed a motion for additur, requesting that the trial court increase its verdict against Pamela Spence to $88,777.50—the total amount Allstate had been required to pay because of the fire.[2] The trial court denied

---

1. The specific content of these clauses will be set forth in the discussion of Issue I.

2. This figure ($88,777.50) represents the sum of the amount paid to BancBoston ($53,261.40), the

Allstate's J.N.O.V. motion against James Spence and granted its additur motion as to Pamela Spence.

Both Allstate and Pamela Spence appealed to the Court of Appeals. Basing its decision on *Ryan v. MFA Mut. Ins. Co.*, 610 S.W.2d 428 (Tenn.App.1980), the Court reversed the judgment in favor of James Spence, holding that the J.N.O.V. should have been granted because the clear language of the insurance policy precluded the application of the "innocent co-insured doctrine" adopted in *Ryan*. The Court affirmed the trial court's ruling on Allstate's motion for additur, holding that because Allstate's claim was for indemnity, and the amount of its damages was undisputed, the trial court was justified in increasing the damages to the full amount that Allstate had been required to pay.

Following this decision, James and Pamela Spence filed applications for permission to appeal pursuant to Rule 11, Tenn.R.App.P. However, on June 24 and 28, 1993, while their Rule 11 applications were pending in this Court, James and Pamela Spence filed motions for relief from the judgments in the trial court pursuant to Rule 60, Tenn.R.Civ. P., alleging that newly-discovered evidence had come to light regarding the cause of the fire that probably would have altered the result at trial. On August 2, 1993, this Court granted both Rule 11 applications. On August 20, 1993, the trial court held oral argument on the Rule 60 motions; and it denied these motions on September 1, 1993. The Spences appealed to the Court of Appeals from that judgment, and when this case was initially set for oral argument in this Court, the Rule 60 appeal was pending in the Court of Appeals. Thus, the same case was pending in the Court of Appeals and the Supreme Court at the same time. We then transferred and consolidated the Rule 60 appeal with the Rule 11 applications that were pending in this Court. Therefore, all issues in this litigation are now before us for resolution.

## I.

The first issue for our determination is whether the Court of Appeals was correct in determining that the "innocent co-insured doctrine" did not apply to this case. To resolve this issue we must first look to the decision that adopted the doctrine in Tennessee—*Ryan v. MFA Mut. Ins. Co.*, 610 S.W.2d 428 (Tenn.App.1980).

In *Ryan*, the plaintiff James Ryan attempted to recover under his homeowner's insurance policy for items of personal property that were destroyed after his wife set fire to their home. Although Ryan had nothing to do with setting the fire, MFA Insurance Company denied his claim, relying upon the following provisions in the policy:

"Insured" means:

(1) the named insured stated in the declarations of the policy; and

(2) if residents of the named insured's household, *his spouse*, the relatives of either, and any other person under the age of twenty-one in the care of the insured.

.     .     .     .     .

This Company shall not be liable for loss by fire or other perils insured against in this policy caused, directly or indirectly, by: ... *neglect of the insured to use all reasonable means to save and preserve the property at and after a loss.*

.     .     .     .     .

Unless otherwise provided in writing added hereto *the Company shall not be liable for loss occurring while the hazard is increased by any means within the control or knowledge of the insured.*

*Ryan*, 610 S.W.2d at 439–440 (emphasis added in *Ryan*).

After the denial Ryan brought an action for breach of contract against MFA; but the trial court granted MFA's motion to dismiss the action. Ryan appealed from the trial court's decision.

The Court of Appeals reversed the judgment of the trial court. After conducting an extensive jurisdictional survey of the law on

---

amount of James Spence's judgment ($30,526.10), and the amount of living expenses it had

advanced to James Spence ($4,990).

this issue, the Court determined that the traditional rule—in which wrongdoing by an insured served as a complete bar to recovery by an innocent co-insured—had been supplanted by a rule allowing the innocent co-insured to recover if: (1) the policy language governing the rights of an innocent co-insured was ambiguous from the standpoint of the reasonable person purchasing insurance; and (2) if the innocent co-insured could show that he had a sole or separate interest in the property claimed in the proof of loss. The *Ryan* court applied this rule to the facts of the case before it as follows:

We find that a reasonable person, reading the provisions in the policy at issue here which refer to fraud of the "insured," etc. would conclude that if *an* insured was guilty of fraud or neglect or increasing of hazard to property, then *he or she* may not recover under the policy. If the company wanted to assure its position, i.e. that misconduct of any insured would bar recovery by any other insured, it might have made it clear and unambiguous in the policy and it might have informed the prospective applicants for insurance of this position from the start. It did not do so in this case and it is bound by the language *it* unilaterally drafted into the "contract" of insurance between the parties.

[Because an insurance contract is construed against the insurer and in favor of the insured], it necessarily results in this case that appellant Ryan should not be barred from recovery because of the misconduct of his wife is setting fire to their house, at least as to those items or contents in which he can show he had the sole or major and separable interest.

*Ryan,* 610 S.W.2d at 437. (Emphasis in original).

### A. Ambiguity of the Policy

Allstate argues that the *Ryan* doctrine is inapplicable to this case because the provisions in the policy dealing with the rights of an innocent co-insured are clear and unambiguous from the perspective of the reasonable purchaser of homeowners insurance. Allstate relies upon the following provisions in the policy to support this argument:

DEFINITIONS.

"You" or "Your"—means the person named on the declarations page as the insured and that person's resident spouse.

"Insured person"—means *you* and, if a resident of *your* household: (a) any relative; and (b) any dependent person in *your* care.

. . . .

INSURING AGREEMENT.

The terms of this policy impose joint obligations on persons defined as an *insured person.* This means that the responsibilities, acts and failures to act of a person defined as an *insured person* will be binding upon another person defined as an *insured person.*

. . . .

CONCEALMENT OR FRAUD

This policy is void if it was obtained by misrepresentation, fraud or concealment of the material facts or if *you* intentionally conceal or misrepresent any material fact or circumstance, before or after loss.

(Emphasis added in policy.)

■ Allstate contends that because the INSURING AGREEMENT provides that acts of any "insured person" are imputed to every other "insured person," and because the "CONCEALMENT OF FRAUD" section provides that misconduct by "you," which is included within the definition of "insured person," serves to void the policy, the policy unambiguously sets forth Allstate's intention to prevent an innocent co-insured from recovering for losses caused by the wrongdoing of an insured. The Court of Appeals agreed with this argument and based its holding thereon.

Although we would be inclined to agree if these were the only provisions applicable to this case, other relevant provisions introduce a substantial amount of ambiguity into the status of an innocent co-insured under the policy. For example, in addition to the "CONCEALMENT OR FRAUD" provision, Allstate relied upon the following provision in its denial letters to James and · Pamela Spence:

LOSSES WE DO NOT COVER

We do not cover loss to the property . . . resulting in any manner from:

. . . . .

6. Intentional or criminal acts of an *insured person*, if the loss that occurs: (a) may be reasonably expected to result from such acts; or (b) is in fact the intended result of such acts.

Although there is no question that section 6, standing alone, does not allow an innocent co-insured to recover because of the "joint obligations" portion of the INSURING AGREEMENT, an amendment to the policy entitled "Tennessee Amendatory Endorsement" provides that *"[t]his exclusion [section 6] applies only to those persons who commit, conspire, collude, direct or acquiesce to such acts."* (emphasis added). Because that amendment nullifies the "joint obligations" component of the INSURING AGREEMENT in the context of intentional or criminal acts of an insured, it appears to represent a complete reversal of Allstate's position toward innocent co-insureds set forth in the main policy. And since it is undisputed that James Spence had nothing to do with setting the fire, it would appear that this specific amendment would entitle him to recover.

Allstate responds that this is not the case because the "CONCEALMENT OR FRAUD" section, not the "INTENTIONAL ACTS" section, governs the disposition of this case. Allstate supports this assertion by arguing that because the acts of "you" (in this case James and Pamela Spence) serve to totally void the policy under the "CONCEALMENT OR FRAUD" section, whereas the "INTENTIONAL ACTS" section applies to all "insured persons" and is merely an exclusion from coverage, it is not necessary to look further than the "CONCEALMENT OR FRAUD" provision in order to determine the outcome of this case.

Allstate's argument is unconvincing for two reasons. Initially, it overlooks the fact that Allstate relied upon the "INTENTIONAL ACTS" provision in denying the claims of James and Pamela Spence in the first place. Therefore, Allstate's assertion that it is absolutely clear that only the "CONCEALMENT

OR FRAUD" section is germane to this case is belied by its own actions. More importantly, however, the provisions at issue send fundamentally contradictory messages concerning the rights of innocent co-insureds when the policy is read in its entirety. Although the "CONCEALMENT OR FRAUD" provision, standing alone, precludes recovery by an innocent co-insured, the amendment to section 6 certainly contemplates such a recovery. That amendment therefore stands in marked contrast to the "CONCEALMENT OR FRAUD" provision.

Allstate attempts to harmonize the two provisions by repeating that a violation of the "CONCEALMENT OR FRAUD" provision by persons defined as "you" serves to void the policy, while the violation of the "INTENTIONAL ACTS" provision by any "insured person" merely serves to exclude coverage for that particular occurrence. This means, it says, that the amendment to section 6 was intended to allow a recovery only for an innocent co-insured *other* than the named insured and his or her spouse ("you"). The clear implication of this argument is that the named insured and his or her spouse ("you") can never be characterized as an innocent co-insured under the policy.

This strained argument is questionable as matter of contractual construction, and it is definitely irrelevant to the question at hand. It is questionable on its merits because the "INTENTIONAL ACTS" provision, as amended, applies to every "insured person"; and this term by definition includes the named insured and his or her spouse. Therefore, on its face, the "INTENTIONAL ACTS" provision does allow a person defined as "you" to recover for the wrongful acts of another person defined as "you." Allstate's interpretation of the policy is cogent only if the reader of the policy is able to ascertain that the "CONCEALMENT OR FRAUD" provision takes precedence over the "INTENTIONAL ACTS" provision, and there is no way to know this unless one is cognizant of the full significance of the legal term "void" contained in the prior provision. This fact highlights the irrelevance of Allstate's argument. The pertinent question here is whether a reasonable person, reading the

insurance contract in its entirety, would realize that the "INTENTIONAL ACTS" provision, as amended, applies only to "insured persons" other than those defined as "you." This construction is debatable as an abstract question of law; and we are quite certain that it would not be construed in this manner by a reasonable person purchasing homeowners insurance. In short, we are convinced that such a person would not be able to ascertain with the requisite degree of certainty Allstate's alleged intention to totally deny an innocent co-insured defined as "you" any recovery under the policy.

### B. James Spence's Interest in the Claimed Property

■ Allstate contends that even if the policy is ambiguous as to the rights of an innocent co-insured, the doctrine as enunciated in *Ryan* is nevertheless inapplicable to this case because James Spence did not have a separate interest in the personal property destroyed in the fire. Allstate bases its argument on the fact that although the marital dissolution agreement purported to divide the property, that agreement did not become effective until almost two months after the fire. Therefore, Allstate concludes, the property was marital property under Tenn.Code Ann. § 36–4–121(b)(1)(A) and thus was jointly owned at the time of the fire.

At first blush, § 36–4–121(b)(1)(A) appears to lend support to Allstate's argument. That section provides, in pertinent part:

"Marital property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce ...

■ However, both § 36–4–121(b)(1)(A) and other sections of the Code make it clear that the concept of "marital property" has no validity in and of itself; the concept has meaning only in the context of a court-ordered property division in a divorce. For example, § 36–4–121(b)(1)(D) provides that *"[p]roperty shall be considered marital property as defined by this subsection for the sole purpose of dividing assets upon divorce and*

*for no other purpose."* (emphasis added). Also, § 36–4–121(a)(1) provides in pertinent part that "[i]n all actions for divorce ... the court having jurisdiction thereof may, *upon request of either party,* ... equitably divide, distribute or assign the marital property between the parties ..." (emphasis added). Therefore, property acquired by spouses during marriage does not automatically become marital property simply because it was acquired during marriage; the parties must first request the court to divide the property as part of formal divorce proceedings. Moreover, it is clear that marital property and jointly-owned property are not equivalent terms. Section 36–4–121(b)(1)(A) provides that "marital property means all ... property acquired by either or both spouses during the course of the marriage ... *owned by either or both spouses as of the date of the filing of a complaint for divorce ...*" (emphasis added). Therefore, it is evident that spouses can own personal property either jointly or individually during the marriage. *See e.g., Manheim v. Manheim,* 60 Misc.2d 88, 302 N.Y.S.2d 473, 479 (Sup.1969) ("there is no rule of law that common possession of marital personalty results in joint ownership"; rather it is a fact-sensitive inquiry).

There is no question in this case that James and Pamela Spence did not request the court to divide the property as part of the divorce proceedings. Therefore, the concept of "marital property" does not apply to this case, and the issue of whether the items of personal property were jointly owned is the same as it is in other contexts—a question of fact for the jury. *See e.g., Willco Kuwait (Trading) S.A.K. v. DeSavary,* 638 F.Supp. 846, 852 (D.R.I.1986); *Southwest Bank & Trust Co. v. Executive Sportsman's Ass'n,* 477 S.W.2d 920, 924 (Tex.Civ.App. 1972); *Parker v. Muse,* 47 Ala.App. 84, 250 So.2d 688, 691 (1971). Thus, since the jury found that James Spence did have a sole or separate interest in the personal property, we must examine the record to determine if there is material evidence to support that verdict. Tenn.R.App.P. 13(d).

The record clearly contains such material evidence. First, both James and Pamela Spence testified that all the property claimed

by James Spence on his second claim was in fact owned by him. Moreover, Pamela Spence submitted a separate itemized list of personal property when the first proof of loss was submitted. Finally, the marital dissolution agreement provides that the parties had divided the personal property and that each would be awarded the personal property in his or her possession at the time of the execution of the agreement (March 12, 1990). While Allstate is correct that the marital dissolution agreement did not become effective until after the date of the fire, and thus was not legally binding on the parties at that time, *see Bruce v. Bruce,* 801 S.W.2d 102, 105 (Tenn.App.1990), it is nevertheless important because it manifests the Spences' intentions with regard to the ownership of the property. And these intentions are consistent with their trial testimony.

Because the homeowners policy issued by Allstate was ambiguous as to the rights of an innocent co-insured, and because there is material evidence to support the jury's finding that James Spence did have a sole or separable interest in the property claimed on the second proof of loss, the holding of the Court of Appeals on this issue is hereby reversed.

## II.

The next issue for our determination is whether the Court of Appeals erred in affirming the trial court's grant of Allstate's motion for "additur." This ruling increased the judgment against Pamela Spence from $4,990 to $88,777.[3]

Pamela Spence argues that the trial court erred because it failed to obtain her consent before ordering the additur. This, she says, violated her right to jury trial as guaranteed by the Seventh Amendment to the United States Constitution and Article I, § 6 of the Tennessee Constitution.

Pamela Spence is correct that the federal and state constitutions require the consent of the party against whom the additur is to be entered. *Dimick v. Schiedt,* 293 U.S. 474, 486, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1935); *McCall v. Waer,* 487 S.W.2d 308, 310

(Tenn.1972); *Kaiser v. Cannon,* 529 S.W.2d 235 (Tenn.App.1975). The rationale for requiring such consent is that when the trial court grants a motion for an additur, it is essentially disagreeing with the jury's determination of damages—which is a question of fact. Because the trial court is acting in its capacity as "thirteenth juror," the right to jury trial clauses of the federal and state constitutions—which require that the jury be allowed to determine all disputed issues of fact, *Finks v. Gillum,* 38 Tenn.App. 304, 273 S.W.2d 722 (1954); *Morgan v. Tennessee Central Ry.,* 31 Tenn.App. 409, 216 S.W.2d 32 (1948)—mandate that the trial court obtain the consent of the party against whom the additur is to be entered. And if that party does not accept the additur, the trial court must order a new trial. Tenn. Code Ann. § 20–10–101(a)(2).

That rationale does not apply to this case because Allstate's motion to increase the judgment, although denominated as a motion for "additur," was in fact a motion to alter or amend the judgment pursuant to Rule 59.04, Tenn.R.Civ.P. This is so because Allstate's damages on its indemnity claim against Pamela Spence were undisputed—the only issue of fact for the jury to decide on the indemnity claim was whether Pamela Spence was responsible for the fire. If the jury did decide that she was responsible for the fire, it was required to award Allstate the total amount it had expended on the claim. This fact is reflected in the trial court's instructions to the jury on this point:

> Now before I read this last part, I need to come back a second and talk to you about Allstate's claim against the Spences. When an insured intentionally burns property and then submits a claim to an insurance company for damages caused by such act, you are instructed that such constitutes fraud and concealment under the policy of insurance, and if you find that Pamela Spence set fire to the property, you should return a verdict in favor of Allstate in the amount awarded by you. That is, if you find that Ms. Spence is guilty of arson, then Allstate is entitled to recover against

**3.** *See* footnote 2, *supra,* as to how this figure was established.

her for ... the money that they've expended.

■ Because there was no factual issue concerning damages, the trial court was not acting as "thirteenth juror" in increasing the judgment to the amount that Allstate had expended due to Pamela Spence's acts. It is, moreover, well settled that a trial court may modify a judgment when the damages awarded by the jury conflict with the undisputed facts concerning damages. *See Martin v. Prier Brass Mfg. Co.,* 710 S.W.2d 466 (Mo. App.1986) (judgment against insurer modified when it exceeded the applicable limits of the insurance policy); *Dixie Ins. Co. v. Federick,* 449 So.2d 972 (Fla.App.1984) (same). Therefore, the holding of the Court of Appeals on this issue is affirmed.[4]

### III.

■ The final issue for our determination is whether the trial court had jurisdiction to entertain the Rule 60.02(5) Tenn.Civ.P. motions filed by the Spences, when this case was pending in this Court. Although it was not specifically raised below, we wish to address this issue, pursuant to the discretion granted us by Rule 13(b) Tenn.R.App.P., for the benefit of the bench and bar.

As stated above, on June 24 and 28, 1993, while their Rule 11 applications were pending in this Court, James and Pamela filed motions in the trial court pursuant to Rule 60.02(5), seeking relief based upon newly-discovered evidence. This allegedly newly-discovered evidence consisted of an affidavit of Patsy Ruth Jones, the previous owner of the Spences' home. In that affidavit, Jones stated that she believed that her step-son, Ben Martin, had burned the Spence home; Ms. Jones's belief was based on Martin's history of setting fires, his emotional problems, and his statements to Ms. Jones that he hated the Spence children.

On August 2, 1993, this Court granted the Rule 11 applications of both James and Pamela Spence. On August 20, 1993, the trial court held oral argument on the Spenc-

es' Rule 60 motions; and it denied these motions on September 1, 1993.

The answer to this jurisdictional question is not readily apparent because there is no guidance in Rule 60.02 as to the proper court in which to file the motion once an appeal is pending. However, Rule 60(b) of the Federal Rules of Civil Procedure is substantially similar to our Rule 60.02, and several federal jurisdictions have addressed the issue. The results of these cases, however, have been far from uniform. One approach endorsed by some federal courts is that the district court has no jurisdiction to consider a Rule 60(b) motion after a notice of appeal has been filed. *See e.g., Smith v. Lujan,* 588 F.2d 1304, 1307 (9th Cir.1979); *Merritt–Chapman & Scott Corp. v. City of Seattle,* 281 F.2d 896 (9th Cir.1960); *Zig Zag Spring Co. v. Comfort Spring Corp.,* 200 F.2d 901, 907–08 (3d Cir. 1953); *Hirsch v. United States,* 186 F.2d 524, 525 (6th Cir.1951); *Baruch v. Beech Aircraft Corp.,* 172 F.2d 445 (10th Cir.1949). Under this approach, a party seeking relief from a judgment after the appeal is pending is required to first present his grounds for relief to the appellate court. If that court determines that the matter should be heard, it should remand the case to the district court. *See* Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 2873 (1973). Other jurisdictions, however, adhere to the view that the district court may consider the Rule 60(b) motion during the pendency of the appeal; and if the district court is inclined to grant the motion, the movant may apply to the appellate court for an order of remand. *See e.g., Sine v. Local No. 992, Intern. Broth. of Teamsters,* 790 F.2d 1095, 1097–98 (4th Cir.1986); *Puerto Rico v. SS Zoe Colocotroni,* 601 F.2d 39, 41 (1st Cir. 1979); *Ryan v. United States Lines,* 303 F.2d 430, 434 (2d Cir.1962); *Smith v. Pollin,* 194.F.2d 349, 350 (D.C.Cir.1952). The practical effect of this rule is that the trial court may deny the motion, but it cannot grant the motion without leave of the appellate court. Moreover, if the trial court does deny the motion, the appellate court may consider that

---

4. Had Allstate's motion actually been for "additur," the trial court's ruling would have been unjustified because it totally destroyed the jury's

verdict. *See Foster v. Amcon Int'l, Inc.,* 621 S.W.2d 142, 148 (Tenn.1981).

denial along with the original appeal. *See* Wright and Miller, *supra,* at § 2873.

The latter view is probably followed by more courts than the former. It has the chief advantage of promoting judicial economy because it allows the trial court, who is more familiar with the case, to initially review the motion to determine if it has any merit whatsoever. For this reason, Professors Wright and Miller have lauded it as "preferable in practice." *Id.*

■ However this may be, we decline to adopt a rule that would allow a case to be pending in more than one court at a time. We believe that the potential for administrative oversight would be substantially reduced, and the scarce resources of this Court more efficiently allocated, by the adoption of a rule requiring cases to be kept "together" during the appellate process. The merits of such a rule are patently clear in this situation. Although copies of the Rule 60 motions were filed in this Court on July 29, 1993, we assumed that the trial court would not act on these motions because the Rule 11 applications were pending in this Court. This assumption proved to be erroneous, and we were unaware at the time this case was originally argued that the Rule 60 appeal was pending before the Court of Appeals. Once we were apprised of this fact, it was necessary to consolidate the appeals and reschedule the oral argument, because if the Court of Appeals had reversed the holding of the trial court on the Rule 60 motions, the issues presented in the Rule 11 applications (and discussed in Parts I and II of this opinion) would have been mooted. Such action by the Court of Appeals, or indeed by the trial court if it had granted the motion in the first instance, would have served to squander the substantial time spent by this Court in deciding whether the Rule 11 applications were meritorious. Overall, this potential for either administrative oversight or for a misallocation of valuable judicial resources engendered by allowing the trial court to entertain motions for relief from judgment once an appeal is pending outweighs the consider-ations of judicial economy promoted by allowing the trial courts to consider such motions.

■ Therefore, we hold that a trial court has no jurisdiction to consider a Rule 60.02 motion during the pendency of an appeal.[5] If a party wishes to seek relief from the judgment during the pendency of an appeal, he should apply to the appellate court for an order of remand. We stress that because the trial court will most likely be in a better position to quickly assess the merits of such a motion, leave should be freely granted by the appellate court if the motion is not frivolous on its face.

In light of this holding, the trial court here technically was without jurisdiction to hear the motions filed by James and Pamela Spence. Although ordinarily a party seeking relief from the judgment during the pendency of the appeal would be allowed to apply for an order of remand, this is unnecessary in this case because we agree with the trial court that the motions are not meritorious. Although Pamela Spence stated in an affidavit submitted in support of her Rule 60 motion that she was not aware of the information contained in the Jones affidavit until June 1993, she stated in her deposition, taken in October 1991, that she thought that Ben Martin may have been the party responsible for setting the fire. Therefore, the evidence contained in the affidavit of Martin's stepmother was not "newly-discovered," and Pamela Spence's decision not to attempt to place the blame for the fire on Ben Martin at trial appears to be merely a tactical decision. Moreover, even if the evidence was in some sense newly-discovered, relief from a judgment on the basis of such evidence may only be granted where the evidence could not have been discovered through the exercise of reasonable diligence. *Crain v. Brown,* 823 S.W.2d 187, 192 (Tenn.App.1991). Here, Pamela Spence had some idea at least as early as October 1991 that Ben Martin may have been responsible for the fire, and yet she took no steps to interview his step-mother—the person who had sold the home to the Spences. This failure constitutes a lack of

---

5. All decisions to the contrary are hereby expressly overruled. *See e.g., Andrews Distributing* *v. Oak Square at Gatlinburg,* 757 S.W.2d 663, 665 (Tenn.1988).

due diligence, and therefore the judgment may not be disturbed at this late date.

For the foregoing reasons, the judgment of the Court of Appeals is affirmed in part and reversed in part.

REID, C.J., and O'BRIEN, ANDERSON and BIRCH, JJ., concur.