IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 1, 2017

## JADE C. NUNNALLY v. ADAM NUNNALLY

**Appeal from the Circuit Court for Hamilton County**
**No. 15-D-1419      L. Marie Williams, Judge**

_____

### No. E2016-01414-COA-R3-CV

_____

In this divorce action, Wife appeals the trial court's designation of Husband as the primary residential parent for their daughter. For his part, Husband contends the trial court erred by awarding Wife unsupervised visitation. He also contends the child support award is based on an erroneous determination of the parties' gross monthly income. Finding no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the Court, in which THOMAS R. FRIERSON, II and BRANDON O. GIBSON, JJ., joined.

Alan R. Beard, Chattanooga, Tennessee, for the appellant, Jade C. Nunnally.

J. Christopher Clem, Chattanooga, Tennessee, for the appellee, Adam Nunnally.

### OPINION

Adam Nunnally ("Husband") and Jade Nunnally ("Wife") married on March 30, 2013. They are the parents of one child, a daughter born in April of 2015. Three months after the birth of their daughter, Wife filed for divorce and proposed a parenting plan that allowed Husband no visitation with their child. Husband filed an answer and submitted a proposed parenting plan designating him as the primary residential parent and limiting Wife's parenting time to supervised visitation. The relevant history of the parties is set forth below.

In 2008, five years prior to the marriage, Wife succumbed to the stress of a rigorous nursing school program and began to experience severe depression, anxiety, mood swings, and insomnia. Fearing for Wife's safety, her mother took her to the emergency room where medical personnel observed Wife engaged in what we describe as

bizarre behavior that justified admitting Wife to a psychiatric hospital.[1] Dr. Vijayalakshmi Appareddy, a psychiatrist, diagnosed Wife with bipolar disorder with psychosis. Dr. Appareddy prescribed psychotropic medications, which significantly improved her mood, and she was discharged from the hospital with the recommendation that she continue psychiatric monitoring.

Wife did not believe she needed medications and stopped taking them. Less than three years later, in February 2011, she was again admitted to the psychiatric facility due to the intervention of her parents. According to the facility's records, Wife entered the hospital "cussing and screaming at parents and staff." The record stated that she exhibited irrational thinking, bizarre behaviors, "flight of ideas," and "pressured speech." Wife resumed her medication regimen, and, as a result, she improved and was discharged.

In March of 2013, Wife required a third hospitalization. She told Dr. Appareddy that she had difficulty coping with the stress related to her impending marriage to Husband and suffered from mood swings, insomnia, and a fear that she would die. Dr. Appareddy also testified that, at times during her treatment, Wife complained about her father being, *inter alia*, "emotionally abusive." She stopped seeing Dr. Appareddy as of May 23, 2013, against her recommendation that she continue psychiatric treatment. Dr. Appareddy noted that Wife's diagnosis was on-going and that she had a "[l]ong history of noncompliance with medications and poor insight into her problems."

Shortly after being discharged from the hospital, the parties married. Two years later, Wife gave birth to the couple's only child. Initially, Wife stayed home with the baby, and Husband worked. In their text messages to one another, Wife and Husband consistently showed concern and affection for their new baby. They traded messages about the baby's doctor's appointments, nap schedule, and growth spurts. At the same time, Wife sent Husband numerous text messages in which she expressed frustration with being the child's primary caregiver. Wife sent messages to Husband stating that she had "gone insane," had "reached [her] breaking point," and that she could not "do this all day long and night with [zero] breaks." Moreover, Wife often admonished Husband for working late and for failing to adequately assist her with the baby's care. She also complained that she did not have time to shower, to eat, or to otherwise take care of her physical and emotional needs. However, at other times, Wife effusively praised Husband for his assistance with the baby. For example, Husband received text messages from Wife telling him that he was "doing such an awesome job" and that their baby was "beyond lucky" to have him as her father.

---

[1] Out of respect for Wife and her daughter, we are not including details of Wife's bizarre behavior in this opinion.

- 2 -

In addition to complaints about Husband's lack of support, Wife seemed distressed about her parents and their lack of support. Husband received text messages from Wife in early June of 2015 that reflected Wife's irritation with her mother. One of the messages contained the following: "My mom doesn't like babysitting and I usually have to beg her to watch [the baby] for [one] hour while info [sic] to the store. I have to beg her. . . . I've been telling her we have no food here and she still won't help me." Wife's text messages also indicated that she and her parents often argued. Husband expressed concern about the turmoil and its effect on their daughter, and he sent Wife a text message stating, "Please don't yell around [the baby]."

Sometimes Wife's text messages concerning her parents went beyond mere complaints about their lack of support. In many of her messages to Husband, Wife expressed fear over leaving the child with her parents. One of the messages from Wife contained the following: "[T]hey smoke [three] packs a day of cigs and my dad carried [the baby] around the other day after he had been drinking. . . . Plus, I'm afraid of my dad . . . ." To the contrary, Wife praised Husband's parents in her messages to Husband. Husband received messages from Wife telling him that he had "an awesome family," that his family was "100% better" than hers, and that his family was one of the reasons why she married him. Despite Wife's assertions that her family provided no support, her text messages to Husband indicated that her mother and her mother-in-law frequently babysat so that Wife could run errands and, generally, have time to herself. In one of the messages sent to Husband, Wife writes: "Your mom . . . just left with [the baby] for a few hours. I'm going to clean the house and to get my hair done." She also writes, "[My mother] hates babysitting. I stayed gone for [six] hours or whatever and it was 'too long.'"

In late June and early July of 2015, Wife had several emotional outbursts. In one text message, she threatened to keep Husband from seeing their child, "Have fun with your losers you associate with. Your daughter won't even know who you are!" She also expressed annoyance with Husband's dog and his fish tank, stating: "Omg!!! Your gonna have to do something about this dog! He's barked all day and has woken her up!!!!! . . . Also the fish tank is too damn loud and I'm tired of listening to it all day!!!!!!!!!!!! . . . You have by tomorrow to fix these problems." Two days later, Wife informed Husband that she had killed his fish, "The fish are gone!!!!!!! Bye fish!!!!!!! Payback is a BITCH!!!!!" Husband responded to Wife by suggesting she seek psychological help: "You need to admit yourself into the hospital tonight. Your actions have shown that you are not in the right frame of mind." Wife's mother also sent text messages to Husband around that time, expressing concern for Wife's mental and emotional well-being. In one text message she wrote, "I pray [Wife] will want to get the help she desperately needs. We are all heartbroken over this. We are a hundred percent behind [Husband]."

- 3 -

On July 15, 2015, Wife filed for divorce and requested a restraining order against Husband, alleging that Husband removed their child from her care for three days and refused to allow her to see the child. She also alleged that he changed the locks on their home, "had the utilities turned off," and withdrew money from their bank account, which left Wife with only $200 to care for herself and their child. She submitted a proposed parenting plan that allowed Husband no visitation with their daughter. The court granted the restraining order.

Husband counterclaimed for divorce and submitted a proposed parenting plan that designated him as the primary residential parent and limited Wife's parenting time to supervised visits. He also filed a motion to dissolve the restraining order, alleging that Wife, not Husband, changed the locks and vandalized the home. The court dissolved the restraining order and created a temporary parenting schedule.

The divorce proceeded to trial on April 5, 2016. At trial, Wife denied her diagnosis of bipolar disorder with psychosis and denied that she needed psychotropic medications. Wife claimed that, prior to the divorce action, Husband worked 12-hour days, would not prepare the baby's bottles, and abused alcohol. When confronted with her text messages praising Husband for his involvement in their child's care, she dismissed those messages saying, "He must have finally changed a diaper by himself and fixed a bottle…. I had to beg him to watch her so I could take a shower." She also testified that, while the divorce was pending and Husband had time with the baby, he cared for the child in an incompetent manner. According to Wife, Husband had four bottles for the child, none of which were the correct size, and he didn't thoroughly wash the bottles. She further testified that Husband did not own a highchair and that he let the child play with Q-tips. Wife also claimed that Husband owned a "vicious" dog and a gun. Moreover, Wife testified that Husband often picked their daughter up late for his parenting time, and she admitted that she threatened to penalize him for being more than 15 minutes late by not allowing him to have their daughter at all on those days. Wife testified that, unlike Husband, she took "great care" of their daughter: "I do everything for her. I take her to church. I take her to the park, the mall. I buy her clothes. I cook for her. I signed her up for the Book of the Month Club."

Wife testified that she worked approximately 24 hours a week making $24.35 an hour as a nurse at the psychiatric hospital where she was once a patient. She testified that she previously had a full-time job making $5,000 a year more than her current salary, but that she quit so she could spend more time with the child. She only worked when her daughter was sleeping or when Husband had her, so the child would never know she was gone. She said her parents watched the baby while she was at work, and, contrary to her text messages, she had high praise for her parents, "I love my father very much. He's great with [the child]. . . . [My mother's] helped me a lot." She claimed that the disparaging text messages about her parents resulted from arguments, and that she did not mean anything she said. Also, despite text messages that indicated otherwise, Wife

- 4 -

claimed that Husband's family cared very little for their granddaughter and saw the baby rarely and only at their convenience.

When Wife's mother testified, she denied the text messages sent from her phone that expressed serious concern for Wife's mental and emotional well-being, claiming that one of her daughters wrote the messages without her knowledge. She also denied Wife's diagnosis, explaining that she only took Wife to the emergency room in 2008 because Wife was having trouble sleeping. Wife's mother testified that Wife lived with her and with Wife's father and that Wife was coping well. Contrary to Wife's text messages about her father, Wife's mother testified that he did not have an alcohol problem and was never abusive toward anyone. The mother also testified that Wife would soon be moving into a home of her own that is close to their home. Wife's father did not testify.

Husband testified that he worked 40 hours per week at Coyote Logistics and made $17 an hour. Additionally, he said he earned a commission, but he never specified the amount. As to Wife's allegations that he abused alcohol, Husband testified that he had not abused alcohol since completing a treatment program in 2006 or 2007. He said he helped Wife take care of the baby in the evenings after he got home from work, but that she often got angry with him because she did not believe he provided enough support. In describing Wife's behavior, Husband testified as follows: "She is delusional, erratic. She has depressed lows and very high manic episodes where she is just busy-body everywhere and then starts yelling and screaming because I'm not doing enough." He also stated that Wife had a contentious relationship with her parents and that she argued with them often. Husband confirmed that he was a gun owner and testified that he kept the gun unloaded and in a locked box in a cabinet. He also confirmed that he owned a dog and testified that the dog had never exhibited vicious or aggressive behavior. Husband said his parents and his sister assisted him with the baby when he was working. He also stated that Wife loved their child, but had serious mental issues, and for that reason, her visitation should be supervised.

Three members of Husband's family testified at the trial: his father, his mother and his sister. Husband's father testified that he supported Husband financially when he needed it, and that he and Husband's mother also helped take care of their granddaughter while Husband worked. He said he had a good relationship with his son and with his granddaughter and enjoyed spending time with them. He also testified that he loved Wife, and said his relationship with her had been very good, though frequently "she would argue and yell, slam cabinets, and I would have to give some advice, counsel." Husband's mother testified that Husband was a "very good son" and a good father to his daughter. She testified that she liked Wife and got along with her. She also verified Husband's testimony that his dog never exhibited vicious or aggressive behavior. Husband's sister testified that she had a good relationship with Husband and provided support to him when he needed it. She said she had a good relationship with Wife before the divorce action but did not have much communication with her after.

After considering the factors listed in Tenn. Code Ann. § 36-6-106, the trial court determined that both parents had a strong emotional bond with the child; however, the court believed that Husband would provide a more stable environment, and he was more willing to facilitate a relationship between the child and her mother. The court stated, "For [Wife] to be able to appropriately perform parenting responsibilities in the future, she must deal with her diagnosis and comply with appropriate treatment." Thus, the court designated Husband as the primary residential parent and awarded Wife parenting time on alternate weekends. In addition, the court awarded Wife parenting time from 10:00 a.m. to 7:00 p.m. on Tuesdays during the weeks she did not have the child for the weekend. The court determined that Wife would pay Husband $443 a month in child support based upon the gross monthly income, which the trial court calculated using each parent's hourly rate as stated at trial. The trial court entered a final order on June 20, 2016, and this appeal followed.

## STANDARD OF REVIEW

In child custody and visitation cases, the paramount concern is the welfare and best interest of the child. *Luke v. Luke*, 651 S.W.2d 219, 221 (Tenn. 1983). These determinations often pivot on inconspicuous factors, such as the trial court's assessment of the demeanor and credibility of the witnesses while testifying. *Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013). Because trial courts are in a better position than appellate courts to make those assessments, an appellate court will not reverse a trial court's decision concerning the details of a parenting schedule absent an abuse of discretion. *Id*. Nevertheless, the abuse of discretion standard of review does not immunize a trial court's decision from any meaningful appellate scrutiny. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). When reviewing a trial court's discretionary decision, the appellate court should determine, where applicable, whether there is a factual basis for the decision in the record, whether the court correctly identified and properly applied the relevant legal principles, and whether the decision is within the range of acceptable alternative dispositions. *Id*.

## ANALYSIS

Both parties raise issues on appeal. Wife contends the trial court erred by designating Husband as the primary residential parent. Husband contends the trial court erred in: (1) not requiring supervised visitation for Wife; and (2) establishing the amount of child support based upon the hourly rate, rather than the parties' monthly income, which included a shift differential for Wife and a commission and bonus pay for Husband. We will discuss each issue in turn.

## I. PRIMARY RESIDENTIAL PARENT

Wife takes issue with the trial court's finding that she did not have the mental fitness necessary to be the primary residential parent. She claims that the trial court erred because it based its determination on the testimony of a psychiatrist who had not seen Wife in three years. She further argued that the psychiatrist never observed her with the child and could not say whether her diagnosis affected her ability to parent. After reviewing the record, we find that the trial court based its conclusion, not only on the psychiatrist's testimony, but also on other testimony and evidence presented at trial. We have also determined that the evidence preponderates in favor of the trial court's findings.

A final decree in a divorce action involving minor children must include a permanent parenting plan. Tenn. Code Ann. § 36-6-404(a). A permanent parenting plan is "a written plan for the parenting and best interests of the child, including the allocation of parenting responsibilities and the establishment of a residential schedule." Tenn. Code Ann. § 36-6-402(3). Designing a residential schedule includes, *inter alia*, designating the primary residential parent. Tenn. Code Ann. § 36-6-402(5). Generally, the primary residential parent is the parent with whom the child resides more than fifty percent of the time. Tenn. Code Ann. § 36-6-402(4).

In determining who should be the primary residential parent and what the residential schedule should be, the court should consider the following factors set forth in Tenn. Code Ann. § 36-6-106(a):

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

When the trial court made its assessment, it decided to give more weight to the testimony of Husband and his witnesses, because they appeared more credible than Wife and her mother. The trial court then considered every statutory factor except for factor (13), which the court deemed inapplicable. It found that both Husband and Wife attended the court ordered parent education seminar, had a strong emotional bond with the child, and provided for the child's daily needs. The trial court also found that the child had a close relationship with extended family members on both Husband's and Wife's side, and the court further observed that "a good bit of the child's caregiving has been accomplished by grandparents." The court found no evidence of abuse on the part of either parent. Thus, the court determined that factors (1), (3), (4), (5), (6), (9), (11), and (12) weighed in both parents' favor, and neither party disputes those findings on appeal.

While some factors weighed in both parents' favor, the other factors weighed in Husband's favor. The court found that Husband had "excellent potential for future performance of parenting responsibilities," would be willing to encourage a bond between the child and her mother, and no longer abused alcohol. Moreover, the court found that the paternal grandparents supported Husband and had a positive influence on the child. To the contrary, the court found that Wife's mental illness caused her to have frequent emotional outbursts that alienated members of her core support group. The court also questioned the ability of family members to help her with these serious mental health issues. It concluded that Wife's potential as a parent was dependent upon her willingness to face her illness and to seek treatment. The evidence preponderates in favor of these findings.

According to the testimony of Dr. Appareddy, Wife suffered from bipolar disorder with psychosis. Though Dr. Appareddy had not seen Wife in three years, she characterized Wife's diagnosis as ongoing, and she explained that the disorder required treatment to control symptoms such as mood swings, insomnia, paranoia, anxiety, and fearfulness. Dr. Appareddy contended that Wife had little insight into her condition, and

the court correctly observed that Wife exhibited this lack of insight while testifying. Wife's primary support, her mother, also denied Wife's diagnosis and minimized her psychiatric history, testifying that Wife's hospitalization in 2008 resulted from a lack of sleep. However, the medical records from that time tell a different story. Additionally, the evidence at trial left many unanswered questions regarding Wife's relationship with her father, who did not testify.

The court also correctly determined that Wife's text messages "paint a picture very consistent with the characteristics identified in the medical reports." As the court explained, in her messages, Wife exhibited "significant variations in mood, great frustration in dealing with the child, unstable relationships with her core family, and a tendency to lash out and blame others." Consequently, it found that Wife lacked the mental and emotional fitness necessary to provide her daughter with a stable environment. The court wrote, "This is a very young child. She needs stability in her life and needs consistent love and care. She does not need to be exposed to emotional outbursts, frustration and an inability to perceive reality accurately."

We find ample evidence in the record to support the trial court's finding that Wife is in denial about her diagnosis, exhibits difficulty coping with stress, lashes out at others, and has an unstable relationship with her core support group. With the foregoing in mind, we have determined that the trial court acted within its discretion in designating Husband as the primary residential parent. Therefore, we affirm the trial court's decision.

## II. SUPERVISED VISITATION

Husband asserts that the trial court erred in ordering unsupervised visitation for Wife because she is emotionally and mentally unstable and poses a danger to the child.

Except in limited circumstances, it is the public policy of this state to award visitation to the alternate residential parent sufficient to encourage a bond between the parent and child. *Melvin v. Melvin*, 415 S.W.3d 847, 851 (Tenn. Ct. App. 2011). To that end, courts favor the least restrictive visitation plan possible under the specific circumstances of the case. *Id.* Tenn. Code Ann. § 36-6-301 permits supervised visitation if the parent has abused the child or if the child's physical or emotional health is in peril. *Allen v. Allen*, No. W2016-01078-COA-R3-CV, 2017 WL 908319, at *12 (Tenn. Ct. App. March 7, 2017). Likewise, the court may restrict visitation in accordance with Tenn. Code Ann. § 36-6-406 in cases of abuse or abandonment. *Id.* The court may also award supervised or unsupervised visitation after considering the best-interest factors listed in Tenn. Code Ann. § 36-6-106 (a), as the trial court did here. *Id.*

Applying the best-interest factors, the trial court found that Wife did not physically or emotionally abuse the child. Though Wife frequently exhibited outbursts against Husband and against her parents, she consistently showed affection and concern

- 10 -

for her daughter. She testified, "I do everything for her. I take her to church. I take her to the park, the mall. I buy her clothes. I cook for her. I signed her up for the Book of the Month Club." Husband did not dispute this aspect of her testimony, nor did Husband present any evidence that Wife had ever physically endangered their child. The court did indicate that the child could be "exposed to emotional outbursts, frustration and an inability to perceive reality accurately" while in Wife's care. The court also noted that Wife's frustration with her role as the child's primary caregiver often led to her emotional outbursts. The court remedied the problem by shifting that responsibility to Husband. Thus, the trial court acted within its discretion in allowing Wife unsupervised visitation.

## III. CHILD SUPPORT

Husband argues that the trial court erred when it calculated Husband and Wife's gross monthly income for child support using the hourly rate rather than the parties' actual monthly income, which varied based on the shift differential for Wife and commission and bonus pay for Husband.[2]

Like child custody matters, we review child support determinations under the abuse of discretion standard. *Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000). A trial court's determination of a party's income is a factual finding, which is given a presumption of correctness on appeal. *Johnson v. Johnson*, No. M2008-00236-COA-R3-CV, 2009 WL 890893, at *5 (Tenn. Ct. App. April 2, 2009). The Tennessee Child Support Guidelines ("the Guidelines") set forth the method to be used by the court to calculate the gross income of each parent. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a). Generally, a court may determine a parent's gross income based upon his or her base salary along with commissions, bonuses, and/or overtime pay. *Id.*

At trial, Wife testified that she earned $24.35 per hour and worked for 24 hours per week. She also stated that she occasionally earned "shift differential" income and entered three paychecks into evidence. Husband did not impeach Wife's testimony regarding her income or introduce any evidence regarding Wife's occasional shift differential income. Husband testified that he earned $17 an hour and worked 40 hours a week. He admitted on cross-examination that he received commissions in addition to his base salary, but there was no evidence approximating the amount he earned in commissions. The court found that Husband's gross monthly income was $2,946.66, and

---

[2] Husband also contends the trial court should have imputed income to Wife based upon her previous job working full-time. Husband did not identify this as an issue in his brief as required by Tenn. R. App. P. 27(a)(4); he merely argued it in his brief. An issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn. R. App. P. 27(a)(4). *See Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012). Because Husband did not designate this as an issue as required by Tenn. R. App. P. 27(a)(4), the issue is waived.

Wife's gross monthly income was $2,532.40, and set child support based on the Guidelines without deviation.

Husband contends the trial court erred by failing to include Wife's shift differential income and his commission and bonus pay. Furthermore, he wants us to reverse and remand the award of child support based on a post-trial stipulation regarding the parties' income, which was filed with the trial court clerk on September 29, 2016.

We find no error with the court's calculation of the parties' gross income based on their hourly rate of income and the hours worked considering the fact that this was the most reliable evidence upon which to determine their income. As for the post-trial stipulation, we will not consider it because the stipulation was filed two months after the trial court lost jurisdiction over this case.

The trial court's final order, which was entered on June 20, 2016, disposed of all of the issues in the case. Thus, it constituted a final judgment. Wife filed her notice of appeal on July 7, 2016. Once Wife perfected her notice of appeal, the trial court no longer had jurisdiction to consider Husband's post-trial stipulation. *First American Trust Co. v. Franklin-Murray Development Co., L.P.*, 59 S.W.3d 135, 141 (Tenn. Ct. App. 2001) ("It should now be plain that once a party perfects an appeal from a trial court's final judgment, the trial court effectively loses its authority to act in the case without leave of the appellate court."); *Spence v. Allstate Ins. Co.*, 883 S.W.2d 586, 596 (Tenn. 1994).

Because the evidence set forth in the post-trial stipulation was filed with the trial court after it lost jurisdiction over this case, we may only consider it if the evidence qualifies as "post-judgment facts." *See* Tenn. R. App. P. 14. Post-judgment facts include only facts occurring after the entry of the judgment being appealed. *Duncan v. Duncan*, 672 S.W.2d 765, 767 (Tenn. 1984); *Office of Disciplinary Counsel v. McKinney*, 668 S.W.2d 293, 297 (Tenn. 1984). The stipulation Husband relies on pertains to pre-judgment facts and Tenn. R. App. P. 14 does not permit a party to relitigate disputed issues by placing before the appellate court evidence not heard by the trial court. *Duncan*, 672 S.W.2d at 768. Because the facts set forth in the stipulation are beyond the scope of Tenn. R. App. P. 14, those facts cannot be considered by this court.

Having examined the facts that were presented to the trial court, we find the evidence preponderates in favor of the trial court's determination of the parties' gross monthly incomes. Therefore, we affirm the award of child support.

## IN CONCLUSION

The judgment of the trial court is affirmed in all respects, and this matter is remanded with costs of appeal assessed against Jade Nunnally.

_____
FRANK G. CLEMENT, JR., P.J., M.S.